**Lenwood WILLIAMS, Jr., Appellant,**

v.

**The SHIPPING CORPORATION OF INDIA, Appellee.**

No. 80–1243.

United States Court of Appeals, Fourth Circuit.

Argued Dec. 4, 1980.

Decided July 7, 1981.

---

John H. Klein, Norfolk, Va. (Breit, Rutter & Montagna, Norfolk, Va., on brief), for appellant.

John R. Crumpler, Jr., Norfolk, Va. (Seawell, McCoy, Dalton, Hughes, Gore & Timms, Norfolk, Va., on brief), for appellee.

Bruno A. Ristau, Dept. of Justice, Washington, D. C. (Alice Daniel, Asst. Atty. Gen., Washington, D. C., Justin W. Williams, U. S. Atty., Alexandria, Va., Eloise E. Davies, Dept. of Justice, Washington, D. C., on brief), for amicus curiae.

Before FIELD, Senior Circuit Judge, and WIDENER and HALL, Circuit Judges.

FIELD, Senior Circuit Judge:

The plaintiff, Lenwood Williams, Jr., a Virginia citizen, filed an action in a Virginia state court against the Shipping Corporation of India, a corporation which is wholly owned by the Government of India, seeking to recover damages for personal injuries allegedly sustained by the plaintiff while working as a longshoreman aboard defendant's ship. The defendant corporation is concededly a "foreign state" within the definition of the Foreign Sovereign Immunities Act (hereinafter the "Immunities Act" or "Act"), 28 U.S.C. § 1603, which includes any corporate entity owned or controlled by a foreign state.[1] The defendant removed the

---

**1.** The Foreign Sovereign Immunities Act of 1976, Pub.L.No. 94–583, 90 Stat. 2891 (codified at 28 U.S.C. §§ 1330, 1602–11 (1976), and amending 28 U.S.C. §§ 1332, 1391, 1441) was enacted Oct. 21, 1976 and became effective ninety days later.

28 U.S.C. § 1603 reads in pertinent part as follows:

§ 1603. Definitions

For purposes of this chapter—

(a) A "foreign state", except as used in section 1608 of this title, includes a political subdivision of a foreign state or an agency or instrumentality of a foreign state as defined in subsection (b).

(b) An "agency or instrumentality of a foreign state" means any entity—

(1) which is a separate legal person, corporate or otherwise, and

(2) which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof, and

case to the federal court, and following removal, moved to strike the plaintiff's demand for a jury trial on the basis of section 6 of the Immunities Act, 28 U.S.C. § 1441(d). In resisting the motion, the plaintiff, noting that the removal petition omitted any reference to the Immunities Act, contended that the district court's jurisdiction could properly be based upon diversity of citizenship pursuant to 28 U.S.C. § 1332(a)(2) and was therefore removable under 28 U.S.C. § 1441(a) which carries no proscription against a trial by jury in the federal forum. The district court rejected Williams' contention that jurisdiction could be predicated upon diversity under section 1332(a)(2) as an alternative to 28 U.S.C. §§ 1330 and 1441(d). In making this ruling, the court concluded that the Immunities Act constituted the sole jurisdictional basis for suits against a foreign sovereign. The court also rejected Williams' contention that the Act violated his Seventh Amendment guarantee to a trial by jury and was, for that reason, unconstitutional. *See Williams v. Shipping Corporation of India*, 489 F.Supp. 526. On this appeal, the plaintiff challenges both of these rulings of the district court.

In considering the issues on appeal, it is necessary to review briefly the history of foreign sovereign immunity leading up to enactment of the Immunities Act. Historically, a sovereign was regarded as immune from judicial coercion both in its own courts as well as those of other nations although, of course, the immunities rested on different bases. A sovereign's immunity in its own courts was a matter of right, while in a foreign court a sovereign's immunity was not a right but a privilege which was granted politically by the forum state. The American doctrine of absolute jurisdictional immunity for a foreign sovereign was announced by Chief Justice Marshall in *The Schooner Exchange v. McFaddon*, 7 Cranch 116, 3 L.Ed. 281 (1812), where he stated that

since all sovereigns possess "equal rights and equal independence" under international law, a sovereign enters the territory of a friendly foreign government "in the confidence that the immunities belonging to his independent sovereign station, though not expressly stipulated, are reserved by implication, and will be extended to him." *Id.* at 136–137.

*The Schooner Exchange* involved a foreign military vessel and left open the question of the immunity of a commercial vessel owned by a foreign sovereign. In 1926, however, the Court applied the principle of absolute sovereign immunity to commercial vessels of foreign states. *Berizzi Bros. Co. v. S. S. Pesaro*, 271 U.S. 562, 46 S.Ct. 611, 70 L.Ed. 1088. The Court concluded that "the principles [of sovereign immunity] are applicable alike to all ships held and used by a government for a public purpose, and that when, for the purpose of advancing the trade of its people or providing revenue for its treasury, a government acquires, mans and operates ships in the carrying trade, they are public ships in the same sense that warships are." *Id.* at 574, 46 S.Ct. at 612. In the ensuing 20 years the inequities consequent to *carte blanche* immunity eventually led to judicial deference to recommendations of exemptions by the State Department. The Court, in effect, moved away from the view that the issue of foreign sovereign immunity was purely a legal question and adopted the view that it was a mixed legal and political question with respect to which determinations of the Executive Branch should be accorded conclusive effect. *See Ex Parte Republic of Peru*, 318 U.S. 578, 63 S.Ct. 793, 87 L.Ed. 1014 (1943) and *Mexico v. Hoffman*, 324 U.S. 30, 65 S.Ct. 530, 89 L.Ed. 729 (1945). The Court's rationale was stated in *Ex Parte Peru*:

[C]ourts may not so exercise their jurisdiction, by the seizure and detention of the property of a friendly sovereign, as to embarrass the executive arm of the

(3) which is neither a citizen of a State of the United States as defined in section 1332(c) and (d) of this title, nor created under the laws of any third country.

Government in conducting foreign relations.

318 U.S. at 588, 63 S.Ct. at 799.

In 1952, the State Department announced in the now famous "Tate letter"[2] that in making a sovereign immunity determination it would no longer apply the traditional or absolute theory of sovereign immunity, but would henceforth apply the restrictive theory of immunity which had gained currency in most civil law jurisdictions. The "Tate letter", however, contained few guidelines for distinguishing between public and commercial acts, and did nothing to depoliticize immunity decisions. In *Victory Transport, Inc. v. Comisaria General*, 336 F.2d 354, (1964), *cert. denied*, 381 U.S. 934, 85 S.Ct. 1763, 14 L.Ed.2d 698 (1965), the Second Circuit, noting that courts of other countries had applied the restrictive immunity doctrine with widely divergent results, held that a foreign government's charter of a vessel to transport wheat was a commercial act, regardless of its underlying public purpose, and stated that it would deny claims of sovereign immunity except for "the categories of strictly political or public acts about which sovereigns have traditionally been quite sensitive." 336 F.2d at 360. The Supreme Court's subsequent denial of certiorari did little to clarify the uncertain parameters of the restrictive theory of immunity.

In addition to the uncertainty of jurisdictional immunity, there was no satisfactory procedure by which a judgment against foreign entities could be enforced, and even in cases in which a foreign sovereign was not accorded jurisdictional immunity, absolute immunity from execution of judgment often produced a right without any effective remedy.[3] It was against this ambiguous and confusing background that the Congress considered and passed the Immunities Act in 1976.

The Immunities Act codified the restrictive theory of sovereign immunity, and its broad purpose, as stated by the House Committee on the Judiciary, is "to provide when and how parties can maintain a lawsuit against a foreign state or its entities in the courts of the United States and to provide when a foreign state is entitled to sovereign immunity." H.R.Rep.No.94–1487, 94th Cong., 2nd Sess. [1976] 5 U.S.Code Cong. & Ad.News 6604, 6604. The Act is designed to accomplish four objectives:

First, it codifies and amplifies the restrictive theory of foreign sovereign immunity.

Second, it depoliticizes the issue of sovereign immunity and places on the judiciary the responsibility of deciding whether in a given case a foreign sovereign is entitled to immunity.

Third, it provides a statutory "long-arm" procedure for obtaining in personam jurisdiction over foreign sovereigns, while eliminating quasi-in-rem jurisdiction based on the attachment of property of a foreign state.

Fourth, it provides judgment creditors specific remedies for the satisfaction of judgments against a foreign state and disposes of traditional absolute immunity from execution.

The Act establishes comprehensive and exclusive standards to be used in resolving questions of sovereign immunity raised by foreign states in either federal or state courts in the United States. Under the legislative scheme a plaintiff may bring a foreign state or one of its agencies or instrumentalities before an American court, obtain a ruling on the sovereign immunity of the entity, and if an immunity is not found to exist secure an adjudication and satisfaction of the plaintiff's claim.

The greater part of the legislation, both substantive and procedural, was included in section 4 of the bill, and is codified in 28 U.S.C. §§ 1602 through 1611. However, to implement the legislative pattern the Con-

**2.** Letter of May 19, 1952 from Acting Legal Advisor Jack B. Tate to Acting Attorney General. 26 Dept. State Bull. 984–85 (1952), reproduced in *Alfred Dunhill of London, Inc. v. Cuba*, 425 U.S. 682, 711, 96 S.Ct. 1854, 1869, 48 L.Ed.2d 301 (1976).

**3.** Reeves, *The Foreign Sovereign Before United States Courts*, 38 Fordham L.R. 455, 455 (1970).

gress found it necessary to modify the subject matter jurisdiction of federal district courts. The most notable change under the Act is the jurisdictional grant under section 2(a) which adds new section 1330 to Title 28 of the United States Code. Section 1330 reads in pertinent part as follows:

(a) The district courts shall have original jurisdiction without regard to amount in controversy of any nonjury civil action against a foreign state as defined in section 1603(a) of this title as to any claim for relief in personam with respect to which the foreign state is not entitled to immunity either under sections 1605–1607 of this title or under any applicable international agreement.

The legislative rationale for this jurisdictional change is stated in the House Report:

Section 1330 provides a comprehensive jurisdictional scheme in cases involving foreign states. Such broad jurisdiction in the Federal courts should be conducive to uniformity in decision, which is desirable since a disparate treatment of cases involving foreign governments may have adverse foreign relations consequences. Plaintiffs, however, will have an election whether to proceed in Federal court or in a court of a State, subject to the removal provisions of section 6 of the bill. [i. e., 28 U.S.C. 1441(d)]

\* \* \* \* \* \*

As in suits against the U.S. Government, jury trials are excluded. See 28 U.S.C. 2402. Actions tried by a court without jury will tend to promote a uniformity in decision where foreign governments are involved.

H.R.Rep., *supra*, [1976] 5 U.S.Code Cong. & Ad.News at 6611–12.

The congressional concern for having claims against foreign states and their agencies heard by judges only is reflected in section 6 of the bill which adds new subsection (d) to section 1441 of Title 28 of the United States Code providing for the removal of actions against foreign states from state to federal courts at the option of defendants. New subsection (d) reads in pertinent part as follows:

Any civil action brought in a State court against a foreign state as defined in section 1603(a) of this title may be removed by the foreign state to the district court of the United States for the district and division embracing the place where such action is pending. Upon removal the action shall be tried by the court without jury. \* \* \*

The legislative analysis of § 1441(d) states:

The bill adds a new provision to 28 U.S.C. 1441 to provide for removal to a Federal district court of civil actions brought in the courts of the States against a foreign state or a political subdivision, agency or instrumentality of a foreign state. In view of the potential sensitivity of actions against foreign states and the importance of developing a uniform body of law in this area, it is important to give foreign states clear authority to remove to a Federal forum actions brought against them in the State courts.

\* \* \* \* \* \*

Upon removal, the action would be heard and tried by the appropriate district court sitting without a jury. (*Cf.* 28 U.S.C. 2402, precluding jury trials in suits against the United States.) Thus, one effect of removing an action under the new section 1441(d) will be to extinguish a demand for a jury trial made in the state court.

H.R.Rep., *supra*, [1976] 5 U.S.Code Cong. & Ad.News at 6631–32.

Both the statutory language and the legislative history evince the congressional desire to achieve uniformity of decisional law in the area of suits against foreign sovereigns.

To conform the existing diversity statute with the new 28 U.S.C. § 1330 and the definition of "foreign state" contained in section 1603, it was necessary to amend the provisions of 28 U.S.C. § 1332. This complementary change was effected by section 3 of the bill. Prior to amendment, § 1332 read:

(a) The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $10,000, exclusive of interest and costs, and is between—

(1) citizens of different States;

(2) citizens of a State, and foreign states or citizens or subjects thereof; and

(3) citizens of different States and in which foreign states or citizens or subjects thereof are additional parties.

After amendment, § 1332(a) reads:

(a) The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $10,000, exclusive of interest and costs, and is between—

(1) citizens of different States;

(2) citizens of a State and citizens or subjects of a foreign state;

(3) citizens of different States and in which citizens or subjects of a foreign state are additional parties; and

(4) a foreign state, defined in section 1603(a) of this title, as plaintiff and citizens of a State or of different States.

The net effect of the amendment was to delete the references to diversity jurisdiction *against* "foreign states" found in former sections 1332(a)(2) & (3), and to add a new subsection (4) providing for diversity jurisdiction only in actions brought *by* foreign states as plaintiffs. The exclusivity of the jurisdictional provisions of the Immunities Act is recognized in the House Report:

Section 3 of the bill amends those provisions of 28 U.S.C. 1332 which relate to diversity jurisdiction of U.S. district courts over foreign states. Since jurisdiction in actions against foreign states is comprehensively treated by the new section 1330, a similar jurisdictional basis under section 1332 becomes superfluous. The amendment deletes references to

'foreign states' now found in paragraphs (2) and (3) of 28 U.S.C. 1332(a), and adds a new paragraph (4) to provide for diversity jurisdiction in actions brought by a foreign state as plaintiff. These changes would not affect the applicability of section 1332 to entities that are both owned by a foreign state and are also citizens of a state of the United States as defined in 28 U.S.C. 1332(c) and (d). See analysis to section 1603(b).

H.R.Rep., *supra*, [1976] 5 U.S.Code Cong. & Ad.News at 6613.

 The plaintiff contends that despite the deletion of "foreign states" from section 1332(a)(2) and its inclusion in new section 1330(a), his action could have been filed originally in the federal forum on the jurisdictional basis that it was an action between "citizens of a State and citizens or subjects of a foreign state" under section 1332(a)(2). Building upon this premise, the plaintiff suggests that his case was properly removable under section 1441(a). In making this argument the plaintiff relies upon two district court decisions. *Rex v. Cia. Pervana De Vapores,* 493 F.Supp. 459 (E.D. Pa.1980) and *Icenogle v. Olympic Airways, S. A.,* 82 F.R.D. 36 (D.D.C.1979). In each of those cases the district court avoided what it discerned to be a serious constitutional question by construing the Act to permit alternative jurisdiction under section 1332(a)(2) and/or section 1331.[4] These courts reasoned that since section 1603, which falls within chapter 97, begins with the words "For purposes of this chapter", the definition of "foreign state" does not extend to section 1332 which is found in chapter 85. Aside from the fact that we cannot accept this hypertechnical analysis of the legislation, we note that section 1330(a), which is also found in chapter 85, refers specifically to section 1603(a). This

4. Each of those cases involved actions originally filed in the district court, and the opinions seem to indicate that considerations applicable to the question of original jurisdiction would not necessarily apply to a case removed to the federal forum pursuant to 28 U.S.C. 1441(d). We find such a bifurcated analysis of the jurisdictional sections of the Act to be unwarranted.

"Congress wished to provide a single vehicle for actions against foreign states or entities controlled by them, to wit, § 1330 and § 1441(d), its equivalent on removal, and to bar jury trial in each."
*Ruggiero v. Compania Peruana De Vapores, etc.,* 639 F.2d 872, 878 (2 Cir. 1981).

argument further ignores the fact that each of the jurisdictional modifications in the Immunities Act specifically refers to section 1603 for the definition of a "foreign state". We are in accord with the observations made by Judge Friendly with respect to this alternative jurisdiction argument in *Ruggiero v. Compania Peruana De Vapores, etc.*, 639 F.2d 872 (2 Cir. 1981). In rejecting such an argument, he stated:

> We are convinced that no such option exists. The argument ignores the provision of § 1330(a) which defines each of these defendants as a foreign state. The same entity cannot be both a foreign state and a citizen or subject of a foreign state. The historic justification for considering foreign corporations to be citizens or subjects of the state of incorporation was that their shareholders were citizens or subjects of that state, * * * and that the suit must be regarded as against them. Section 1603 destroys that fiction with respect to the entities therein defined by providing that for the purposes of the Immunities Act they are to be regarded as states themselves. The conclusion is inescapable from the language of the statute that Congress meant § 1330 to be the exclusive means whereby a plaintiff may sue any foreign state as defined in § 1603(a), at least on the basis of diversity jurisdiction theretofore provided in § 1332(a)(2), and that this entails a non-jury trial.
>
> * * * * * *
>
> The courts must learn to accept that, in place of the familiar dichotomy of federal question and diversity jurisdiction, the Immunities Act has created a tripartite division—federal question cases, diversity cases and actions against foreign states. If a case falls within the third division, there is to be no jury trial even if it might also come within one of the other two.

*Id.* at 875–76.

In our opinion, the plain reading of the statutory language, the legislative history and the overriding purpose of the Immunities Act requires the conclusion that sections 1330 and 1441(d) are jurisdictionally exclusive and bar the plaintiff from a jury trial whether his case is filed originally in the district court or is one removed from a state court.

We turn now to the constitutional question. The Seventh Amendment provides that "[i]n Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved * * *." The Amendment does not "purport to require a jury trial where none was required [at common law]." *Atlas Roofing Co. v. Occupational Safety Comm'n.*, 430 U.S. 442, 459, 97 S.Ct. 1261, 1271, 51 L.Ed.2d 464 (1977). "[I]f the action is a common law suit or the particular issues arise in a common law suit, but no right of jury trial existed under the common law of England as to that type of action, then there is no right to jury trial by virtue of the Seventh Amendment." 5 Moore's Federal Practice ¶ 38.08[5] at 38–55. Our review of the cases discloses nothing which would indicate that a right of jury trial existed under the common law in 1791 with respect to a suit against a foreign government since, because of its recognized sovereign immunity, such a suit could not be maintained at all.

That a suit against a foreign state was unknown to the common law in this country is clear from the opinions in *The Schooner Exchange v. McFaddon* and *Berizzi Bros. Co. v. S. S. Pesaro, supra.* The recognition of the immunity of a foreign sovereign in this country paralleled the common law of England. Although it is extremely doubtful that the King of England was ever suable without his consent, the authorities agree that, in any event, no such right of action existed after the reign of Edward I (1272–1307). *See* historical review and discussion, *Briggs v. Light-Boats*, 11 Allen, (Mass.) 157, 166–74 (1865). The extension of such immunity to foreign sovereigns was also recognized in the English courts, and in 1880 the Court of Appeals held that there was no valid distinction at common law between military and commercial vessels for the purposes of such

immunity. In *The Parlement Belge*, (1880) 5 Prob.Div. 197 (C.A.), [1874–80] A11 E.R. 104, a Belgian government owned vessel employed primarily as a mail carrier between Belgium and England, but also engaged in carrying passengers and freight, rammed an English steam tug. Since the vessel was not a warship and was not engaged exclusively in public activities, the court felt compelled to decide whether it had jurisdiction over the action by determining "whether every part of the public property of every sovereign authority in use for national purposes is not as much exempt from the jurisdiction of every court as is the person of every sovereign." *Id.* All E.R. at 109. The court painstakingly reviewed the cases on the subject, including the decisions in *The Schooner Exchange* and *Briggs v. Light-Boats, supra*, and was persuaded that the law of nations recognized a "public property" class of things that was considered exempt from the jurisdiction of the territorial sovereign's courts. Ships of war were considered to be merely a member of this larger exempt class. The court concluded:

> [t]he principle to be deduced from all these cases is that, as a consequence of the absolute independence of every sovereign authority and of the international comity which induces every sovereign State to respect the independence and dignity of every other sovereign State, each and every one declines to exercise by means of its courts any of its territorial jurisdiction * * * over the public property of any State which is destined to public use * * *.

*Id.* A11 E.R. at 115

We think it is manifestly clear that in 1791 a suit against a foreign government could not be maintained in either the courts of America or England.

It has been on this basis that the Supreme Court has consistently upheld the denial of jury trials in those instances where the United States has from time to time waived its immunity from suit. The rationale of the Court was stated in *McElrath v. United States*, 102 U.S. 426, 440, 26 L.Ed. 189 (1880):

> There is nothing in these provisions [denying a jury trial] which violates either the letter or spirit of the Seventh Amendment. Suits against the government in the Court of Claims, whether reference be had to the claimant's demand, or to the defence, or to any set-off, or counterclaim which the government may assert, are not controlled by the Seventh Amendment. They are not suits at common law within its true meaning. The government cannot be sued, except with its own consent. It can declare in what court it may be sued, and prescribe the forms of pleadings and the rules of practice to be observed in such suits.

The Court's position on this issue was reiterated in *Galloway v. United States*, 319 U.S. 372, 388, 63 S.Ct. 1077, 1086, 87 L.Ed. 1458 (1943):

> It may be noted, first, that the [Seventh] Amendment has no application of its own force to this case. The suit is one to enforce a monetary claim against the United States. It hardly can be maintained that under the common law in 1791 jury trial was a matter of right for persons asserting claims against the sovereign.

*See also Glidden Company v. Zdanok*, 370 U.S. 530, 572, 82 S.Ct. 1459, 1484, 8 L.Ed.2d 671 (1962).

In our opinion this rationale applies with equal force to suits against foreign sovereigns since such actions were also unknown to the common law of England and this country when the Amendment was adopted. In addition to the historical basis for such a conclusion, it is also supported by sound policy considerations. The same fundamentals of international policy which influenced Chief Justice Marshall to recognize the absolute immunity of a foreign state in *The Schooner Exchange* were also appropriate for consideration by the Congress in its decision to eliminate jury trials when it created jurisdiction over suits involving foreign sovereigns. Again we are in accord with the observations of Judge Friendly in *Ruggiero v. Compania Peruana De Vapores, etc., supra*, at 880–81:

We do not at all mean by this that the Seventh Amendment can be avoided simply because that seems a good idea; we mean that there are sufficient reasons why newly authorized suits against foreign sovereigns, authoritatively determined to have been unknown to the common law in 1791, are *sui generis* and should not be deemed to be within the scope of the Seventh Amendment's preservation of jury trial.

Williams also relies upon *Pernell v. Southall Realty*, 416 U.S. 363, 94 S.Ct. 1723, 40 L.Ed.2d 198 (1974) and *Curtis v. Loether*, 415 U.S. 189, 94 S.Ct. 1005, 39 L.Ed.2d 260 (1974), to carry the day for him in his constitutional challenge. Those cases merely reaffirmed the principle announced by Mr. Justice Story in *Parsons v. Bedford*, 3 Pet. 433, 446, 7 L.Ed. 732 (1830), that the term "suits at common law" as used in the Seventh Amendment embraces

> not merely suits, which the common law recognized among its old and settled proceedings, but suits in which legal rights were to be ascertained and determined, in contradistinction to those where equitable rights alone were recognized, * * *.

In the years since *Parsons v. Bedford* was decided, however, the Supreme Court has repeatedly held that the Seventh Amendment has no application to suits against the United States—even to suits in which legal rights were to be determined or monetary damages were sought. *McElrath v. United States, Galloway v. United States,* and *Glidden Company v. Zdanok, supra.* To invoke the Amendment, it is not enough that the nature of the plaintiff's action is "legal" rather than maritime or equitable; the action must also be brought against a defendant who was suable at common law in 1791. Since foreign sovereigns were immune from such suits at common law, we find *McElrath* and its progeny controlling.

We agree with the district court's interpretation of the Act and, similarly, we reject the plaintiff's constitutional argument. Since we find no error in the district court's decision on the merits, the judgment is affirmed.

AFFIRMED.