**Ramiro ARANGO and Gabriella Arango individually and as parents and best friends for their minor children, Anna C. Arango and Krishna O. Arango, Plaintiffs-Appellants,**

v.

**GUZMAN TRAVEL ADVISORS, et al., Defendants,**

and

**Compania Dominicana De Aviacion, C. Por A. (Dominicana Airlines) Defendant-Appellee.**

No. 84–5266
Non-Argument Calendar.

United States Court of Appeals,
Eleventh Circuit.

June 4, 1985.

San Pedro & Fernandez, Miami, Fla., for plaintiffs-appellants.

Galland, Kharasch, Calkins & Short, P.A., Washington, D.C., Celestino Pena, Whitestone, N.Y., Stephen C. Pascal, New York City, for defendant-appellee.

Before GODBOLD, Chief Judge, KRAV-ITCH and HATCHETT, Circuit Judges.

KRAVITCH, Circuit Judge:

This litigation, involving an action for damages by a passenger against an airline, has once before travelled the appellate route. *See Arango v. Guzman Travel Advisors Corp.*, 621 F.2d 1371 (5th Cir.1980). On the present journey, plaintiffs-appellants, Ramiro Arango and his family, claim that the district court should have tried the case to a jury, and that the court erred in ruling in favor of the defendant-appellee, Compania Dominicana De Aviacion (Dominicana). We conclude that the district court properly denied a jury trial in this action, and correctly rendered judgment in favor of the defendant. *Sua sponte,* we raise the question whether we have jurisdiction to hear this appeal. We conclude that we do, but we instruct the district court to take appropriate action upon receipt of our remand.

## I. BACKGROUND

The Arangos' claim arose out of an attempt to vacation in the Dominican Republic. They arranged their trip through a travel agency by purchasing a "package tour" that included round-trip air transportation between Miami and Santo Domingo via Dominicana. Food, lodging and transportation to and from the Santo Domingo Airport were to be provided by the local Sheraton Hotel. Unfortunately for the Arangos, their vacation plans went awry when, upon their arrival at the Santo Domingo Airport, Dominican Republic immigration officials refused to permit Ramiro Arango to enter the country. Apparently the Government of the Dominican Republic maintained a list of "undesirable aliens," which included Ramiro Arango's name. Immigration officials ordered Dominicana to take the Arangos out of the country on its next flight departing for their country of origin. Accordingly, the Arangos were taken to San Juan, Puerto Rico, where they spent the night. The next day, they travelled to Port-au-Prince, Haiti. Three days later, the family returned to Miami.

The Arangos initiated this lawsuit in state court in Florida against four defendants: Guzman Travel Advisors Corporation, from whom appellants purchased their tour package; Trailways Travel and Tourism International Corporation, the tour organizer; Sheraton Hotels and Inns, whose Santo Domingo Hotel was to provide food and lodging for appellants during their stay; and Dominicana. Their complaint alleged negligence, breach of warranty, breach of contract, false imprisonment, and battery. Dominicana, which is the national airline of the Dominican Republic, wholly owned by that nation's government, removed the lawsuit to federal district court. There, Dominicana filed a motion to dismiss, arguing that (1) it was immune from liability, and (2) the complaint failed to state a claim because all of the alleged injuries were caused by the actions of the Dominican Republic immigration officials, and the Act of State Doctrine precluded judicial scrutiny of these acts. Without specifying the ground upon which it relied, the district court granted the motion to dismiss, and the Arangos appealed. The former Fifth Circuit dismissed the appeal

for lack of jurisdiction because the district court's order did not dispose of the claims against the other defendants; thus, there was not a final appealable order. *Arango,* 621 F.2d at 1378. Nevertheless, to expedite the litigation, the court offered some definitive guidelines to resolve the plaintiffs' claims, *id.* at 1378–82, and remanded the case to the district court. In accordance with these directives, the district court dismissed defendant Sheraton from the lawsuit. The clerk of the court then issued an entry of default against defendants Guzman and Trailways, both of whom failed to enter an appearance or file a pleading after Dominicana removed the case to federal court. Final judgment, however, was never entered against either party. When Dominicana moved for summary judgment, the court granted the motion as to the breach of warranty claim, but set the contract and negligence claims for trial. Pursuant to the parties' stipulation that Dominicana was a foreign state within the meaning of 28 U.S.C. § 1603(a), the court tried the case without a jury. After the trial, the court entered judgment for Dominicana. This appeal ensued.

## II. WHETHER THIS COURT HAS JURISDICTION

Preliminarily, we raise the question, *sua sponte,* of whether we have jurisdiction to hear this appeal. Upon the motion of the Arangos, the clerk of the court below issued entries of default against defendants Guzman and Trailways. Fed.R.Civ.P. 55(a). Following the trial, the district court judge ruled from the bench in favor of Dominicana, stating that he would issue his findings and conclusions in written form at a later date. The Arangos' attorney reminded the court that two of the defendants were in default. The judge responded that he did not understand how either party could be responsible for the failed vacation, but he stated that "if there is a requirement that they (plaintiffs) be reimbursed, the amount of their actual damages would be the amount of the $1,000 for the frustration of their vacation and the amount of their damages in San Juan,

which they have alleged or recited to be approximately $75, so those would be the amounts of damages." The court incorporated these conclusions in the order.

■ Our examination of the record and the docket sheet, however, indicates that no final judgment was entered against either Guzman or Trailways. An entry of default is not a default judgment. *See* Fed.R.Civ.P. 55(b) (delineating terms upon which *judgment* of default may be entered); *see also* Fed.R.Civ.P. 58 (requiring that every judgment be set forth on a separate document).

■ Under 28 U.S.C. § 1291, "The courts of appeals ... have jurisdiction of appeals from all final decisions of the district courts of the United States." Without the presence of a certificate under Federal Rule 54(b), the final decision rule ordinarily operates to permit an appeal only from a judgment that finally determines all claims as to all parties. *Tower v. Moss,* 625 F.2d 1161, 1164 (5th Cir.1980). *See generally* 10 C. Wright & A. Miller, Federal Practice and Procedure §§ 2653–2661 (1983).

In *Bankers Trust Co. v. Mallis,* 435 U.S. 381, 98 S.Ct. 1117, 55 L.Ed.2d 357 (1978) (per curiam), the Supreme Court determined that the failure to comport with all procedural rules governing entry of judgments did not necessarily render a court of appeals without jurisdiction. The district court in that case issued a combined opinion and order dismissing the complaint, but failed to issue a separate document entering a final judgment as required by Federal Rule 58. The Supreme Court assumed without deciding that the requirements for an effective judgment set forth in the Federal Rules must be satisfied before an appeal could be brought under section 1291, equating section 1291's requirement of a "final decision," with a "judgment" under the Federal Rules. 98 S.Ct. at 1119 & n. 4. The Court concluded, however, that the sole purpose of Rule 58's separate document requirement was to clarify when the time for an appeal begins to run. *Id.* at 1120; *see* 28 U.S.C. § 2107; Fed.R.App.P.

4(a). This purpose would not be furthered by a holding that appellate jurisdiction does not exist without a separate document entering judgment. 98 S.Ct. at 1120. Furthermore, the appellee never objected to the appeal; thus, the Court deemed that the parties had waived Rule 58's requirement. *Id.* at 1121.

The *Bankers Trust* decision has been used on several occasions to sustain jurisdiction when there was no separate document entering judgment, provided that the district court clearly evidenced that it had entered its final decision. *See, e.g., Diaz v. Schwerman Trucking Co.,* 709 F.2d 1371, 1372 n. 1 (11th Cir.1983); *Hanson v. Town of Flower Mound,* 679 F.2d 497, 500–02 (5th Cir.1982). Some courts have taken jurisdiction even when the appellee objected to the lack of a separate document entering judgment. *See, e.g., International Brotherhood of Teamsters v. Western Pa. Motor Carriers Ass'n,* 660 F.2d 76, 79–80 (3d Cir.1981) (court did not discuss fact that appellee sought to dismiss appeal on this basis); *Leonhard v. United States,* 633 F.2d 599, 611–12 (2d Cir.1980) (party who objected failed to show how entertaining appeal would be prejudicial), *cert. denied,* 451 U.S. 908, 101 S.Ct. 1975, 68 L.Ed.2d 295 (1981).

■■■ Although we are aware of no reported decision in which a court heard an appeal from a multi-party lawsuit when there was no default judgment entered against a party in default, we believe that the *Bankers Trust* rationale is applicable here, given the facts of this case. A default judgment can be entered by the clerk of the court, when, as here, a party is in default for failure to appear. Fed.R.Civ.P. 55(b)(1). The Federal Rules do not even require that parties who default for failure to appear receive notice of the default judgment. 6 Moore's Federal Practice ¶ 55.-05[3] (2d Ed.1983). The Arangos sought to have a default judgment entered at the time they moved for entry of default. The

clerk may have refused to enter judgment because the amount of damages was not a sum certain. Fed.R.Civ.P. 55(b)(1). The extent of damages now being determined, we see no obstacle preventing entry of default judgment. The district court was aware that the two defendants were in default and determined the extent of damage without requesting the two defendants to appear at a hearing. *See* Fed.R.Civ.P. 55(b)(2). The only missing item is an entry of judgment against two parties who have never entered an appearance in this lawsuit from the time it was removed to federal court in 1978. Although dismissal of the appeal might serve to deter careless practice by future litigants, we hold that under the circumstances of this case, the absence of the default judgment does not require dismissal. We instruct the district court to take appropriate action upon receipt of our remand.[1]

## III. WHETHER THE DISTRICT COURT CORRECTLY TRIED THE CASE WITHOUT A JURY

■■■ Dominicana's removal of the case to federal court was based upon 28 U.S.C. § 1441(d), which provides as follows:

Any civil action brought in a State court against a foreign state as defined in section 1603(a) of this title may be removed by the foreign state to the district court of the United States for the district and division embracing the place where such action is pending. Upon removal the action shall be tried by the court without jury....

This section was part of the Foreign Sovereign Immunities Act (FSIA), 28 U.S.C. §§ 1330, 1602–11, which represented a comprehensive effort "to provide when and how parties can maintain a lawsuit against a foreign state or its entities in the courts of the United States and to provide when a foreign state is entitled to sovereign immunity." H.R.Rep. No. 1487, 94th Cong., 2d Sess., *reprinted in* 1976 U.S.Code Cong. &

---

**1.** The liability in this case was not alleged to be joint. Therefore, a judgment in favor of Dominicana is not inconsistent with liability that

would be imposed on the defaulting defendants. *See* 6 J. Moore, Federal Practice ¶ 55.06 (2d ed. 1983).

Ad.News 6604, 6604.[2] Prior to enactment of this legislation, jurisdiction over federal actions brought by and against foreign states and their subjects was based upon diversity of citizenship.[3] Jurisdiction over actions involving foreign parties now depends upon classification of the lawsuit according to categories defined by Congress. For example, 28 U.S.C. § ·1330 provides federal jurisdiction over actions initiated against foreign states:

(a) The district court shall have original jurisdiction without regard to amount in controversy of any nonjury civil action against a foreign state as defined in section 1603(a) of this title as to any claim for which relief in personam with respect to which the foreign state is not entitled to immunity either under sections 1605–1607 of this title or under any applicable international agreement.

A foreign state is defined as:

For purposes of this chapter—

(a) A 'foreign state,' except as used in section 1608 of this title, includes a political subdivision of a foreign state or an agency or instrumentality of a foreign state as defined in subsection (b).

(b) An 'agency or instrumentality of a foreign state' means any entity—

(1) which is a separate legal person, corporate or otherwise, and

(2) which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof, and

(3) which is neither a citizen of a State of the United States as defined in section 1332(c) and (d) of this title, nor created under the laws of any third country.

28 U.S.C. § 1603.[4]

By their express terms, 28 U.S.C. §§ 1330 and 1441(d) prohibit a case brought against a foreign state, as defined in section 1603, from being tried before a jury, whether the lawsuit is initiated in federal court or removed by the foreign state to that forum. Although an issue of first impression in this circuit, other circuits have considered and rejected efforts to circumvent this prohibition against jury trials, concluding that section 1330(a) is the sole source of federal jurisdiction in suits against foreign states. *See McKeel v. Islamic Republic of Iran,* 722 F.2d 582 (9th Cir.1983), *cert. denied,* —— U.S. ——, 105 S.Ct. 243, 83 L.Ed.2d 182 (1984); *Goar v. Compania Peruana de Vapores,* 688 F.2d 417 (5th Cir.1982); *Rex v. CIA. Peruana de Vapores S.A.,* 660 F.2d 61 (3d Cir.1981), *cert. denied,* 456 U.S. 926, 102 S.Ct. 1971, 72 L.Ed.2d 441 (1982); *Williams v. Shipping Corp. of India,* 653 F.2d 875 (4th Cir.1981), *cert. denied,* 455 U.S. 982, 102 S.Ct. 1490, 71 L.Ed.2d 691 (1982); *Ruggiero v. Compania Peruana de Vapores S.A.,* 639 F.2d 872 (2d Cir.1981).[5]

In *Ruggiero,* the Second Circuit determined that jurisdiction in a suit against a foreign corporation that falls within the definition of a foreign state cannot also be predicated on diversity of citizenship, even if the amount in controversy exceeds $10,-

---

**2.** The sovereign immunity issue in this litigation was determined in the prior appellate opinion. *Arango,* 621 F.2d at 1378–80.

**3.** Former 28 U.S.C. § 1332(a)(2) provided:

(a) The district courts shall have original jurisdiction over all civil actions where the matter in controversy exceeds the sum. or value of $10,000, exclusive of interest and costs, and is between—

(2) citizens of a State, and foreign states or citizens or subjects thereof; and
(3) citizens of different States and in which foreign states or citizens or subjects thereof are additional parties.

**4.** Jurisdiction over other actions involving foreign parties is based upon 28 U.S.C. § 1332(a)(2) (action between citizen of a state and citizen or subject of a foreign state), (a)(3) (actions between citizens of different states, in which citizens or subjects of foreign state are additional parties), and (a)(4) (action between foreign state as plaintiff and citizens of a state or of different states).

**5.** The Supreme Court's opinion in *Verlinden B.V. v. Central Bank of Nigeria,* 461 U.S. 480, 103 S.Ct. 1962, 1971, 1973, 76 L.Ed.2d 81 (1983), also supports this conclusion.

000. 639 F.2d at 875–76. The court further rejected the argument that the presence of a federal question could provide an alternative basis for jurisdiction. *Id.* at 876. In spurning these arguments, the court observed:

> The courts must learn to accept that, in place of the familiar dichotomy of federal question and diversity jurisdiction, the Immunities Act has created a tripartite division—federal question cases, diversity cases and actions against foreign states. If a case falls within the third division, there is to be no jury trial even if it might also come within one of the other two.

*Id.* (footnote omitted). The Third, Fourth, and Fifth Circuits followed the *Ruggiero* court's decision. *Goar,* 688 F.2d at 421–23; *Rex,* 660 F.2d at 64–65; *Williams,* 653 F.2d at 880–81; *see also McKeel,* 722 F.2d at 586–87 (following *Ruggiero* on diversity jurisdiction; federal question jurisdiction failed because of absence of federal issue in well-pleaded complaint).

Rather than retrace the paths of those who have tried and failed in their quest for a jury trial, appellants here argue that Dominicana is not an instrumentality of a foreign state within the meaning of section 1603(a). Although Dominicana is not incorporated in a State within the United States, appellants contend that it has several offices within the United States, particularly Florida, has bank accounts in the United States, and pays taxes to the City of Miami, Dade County, the State of Florida, and the United States. These factors, appellants claim, make Dominicana a "de facto local corporation," and remove it from the definition of an instrumentality of a foreign state. We disagree.

First, appellants' current assertion is contrary to their actions in the court below. When Dominicana removed this litigation to federal court, appellants made a demand for a jury trial, but did not object to the basis for removal, section 1441(a). Only foreign states or their instrumentalities can avail themselves of this removal provision.

Moreover, appellants stipulated that this lawsuit is "a civil action seeking *in personam* relief against a foreign state as defined in 28 U.S.C. § 1603(a)...." [6] Finally, in its pretrial order, the district court stated that the case was set to be tried without a jury. Appellants never objected to this Order. We do not ordinarily consider arguments on appeal that were not raised in the court below. *See Sanders v. United States,* 740 F.2d 886, 888 (11th Cir.1984).

Even had appellants advanced this argument earlier, however, we would not agree. Under the definition offered in section 1603(a), a corporation, a majority of whose shares are owned by a foreign government, is a foreign state unless the corporation is "a citizen of a State of the United States as defined in section 1332(c) and (d) of this title", or was "created under the laws of any third country." 28 U.S.C. § 1603(b)(3). Appellants do not argue that Dominicana was created under the laws of a third country. Furthermore, section 1332(c) provides:

> For the purposes of this section and section 1441 of this title, a corporation shall be deemed a citizen of any State by which it has been incorporated and of the State where it has its principal place of business....

The district court was presented with no evidence that Dominicana is incorporated in the State of Florida, or that Florida is Dominicana's principal place of business. Appellants cite no cases in support of the view that Dominicana's activities automatically render it a citizen of Florida within the meaning of section 1332(c). Appellants' argument that Dominicana should be treated as a citizen of Florida because it is a "de facto" Florida corporation is particularly unpersuasive, given Congress' definition of a foreign state. Congress could have chosen to exclude from foreign state status a foreign corporation that does a substantial part of its business in the United States, or one that pays taxes in the United States. It chose not to, and there is no reason to question this judgment.

---

**6.** Order Setting Cause for Trial at 1; Record at 462.

■ Appellants argue that to permit jury trials in some actions but not in this one violates the equal protection principles subsumed within the due process clause of the fifth amendment. Their argument is intertwined with the question of whether there is a constitutional right to a jury trial in actions against foreign states. The seventh amendment provides in part that "in suits at common law, where the value in controversy shall exceed twenty dollars, the right of a trial by jury shall be preserved...." The seventh amendment did not create a right to trial by jury. 5 J. Moore, Federal Practice ¶ 38–08[5] at 38–55 (2d ed. 1984). Rather, the amendment functions to preserve the right that existed with respect to particular kinds of actions at common law. The reference to "common law" requires that we examine the common law of England in 1791, the year the seventh amendment was adopted. 9 C. Wright & A. Miller Federal Practice and Procedure § 2302 at 14–15 (1971). Because actions against foreign sovereigns were not permitted in 1791, we conclude that the seventh amendment does not require a jury in a suit against a corporation owned by a foreign sovereign.

The Second, Third, Fourth, and Fifth Circuits already have held that the FSIA's requirement of a nonjury trial does not violate the seventh amendment. *Goar,* 688 F.2d at 424–27; *Rex,* 660 F.2d at 65–69; *Williams,* 653 F.2d at 881–83; *Ruggiero,* 639 F.2d at 878–81. Writing for the Second Circuit in *Ruggiero,* Judge Friendly reviewed the history of the immunity of foreign sovereigns from suits. 639 F.2d at 878–879. At common law, suits against foreign sovereigns were not permitted. *See The Schooner Exchange v. McFaddon,* 11 U.S. (7 Cranch) 116, 136–37, 3 L.Ed. 287 (1812). This immunity was based upon the principles that all sovereigns possessed "equal rights and equal independence" under international law, and that a sovereign enters the territory of a friendly foreign

nation confident that immunities conferred upon it by reason of its sovereignty will be preserved. *Id.* The same immunity extended to commercial entities owned by foreign governments. *Berizzi Brothers Co. v. S.S. Pesaro,* 271 U.S. 562, 46 S.Ct. 611, 70 L.Ed. 1088 (1926). During the middle of this century, international custom changed, and the Supreme Court began to recognize that whether a foreign government should be afforded immunity from liabilities arising out of commercial transactions should depend upon whether the State Department considered the abolition of immunity in the circumstances to be inimical to United States foreign relations. *See Republic of Mexico v. Hoffman,* 324 U.S. 30, 65 S.Ct. 530, 89 L.Ed. 729 (1945); *Ex Parte Republic of Peru,* 318 U.S. 578, 63 S.Ct. 793, 87 L.Ed. 1014 (1943). Congress, apparently dissatisfied with the results obtained under this system, directed the federal courts to determine whether immunity should be accorded in particular circumstances, using the categories codified by the FSIA as guidance. *See* H.R. Rep. at 7, 1976 U.S.Code Cong. & Ad.News at 6605–06.

Thus it is clear that suits against foreign governments or commercial entities controlled by them only recently have been permitted to go forward. Even now, these lawsuits have been allowed only because of a change in executive and legislative policy, not by operation of common law principles—the law of liability of foreign sovereigns is in fact *sui generis. Rex,* 660 F.2d at 68; *Ruggiero,* 639 F.2d at 881. If these suits were not permitted in 1791, it is inexorably clear that no right to a jury trial attached under the seventh amendment. Nothing has been presented that contradicts this conclusion. Therefore, we agree with the other circuits that have considered the issue, that the FSIA's nonjury trial requirement does not offend the seventh amendment.[7]

---

7. We caution that our analysis does not mean that the seventh amendment is not applicable to any cause of action created after 1791. Rather, seventh amendment rights may attach to a

cause of action not in existence in 1791, "if it involves rights and remedies of the sort traditionally enforced in an action at law or if its nearest historical analog is an action at com-

■ Appellants' equal protection argument is also without merit. There is a rational basis for Congress' decision to classify commercial entities owned by foreign governments in the same category as the governments themselves, in that historically both were afforded immunity as foreign sovereigns. *See Berizzi Bros.*, 271 U.S. at 574, 46 S.Ct. at 612. The stated reason for disallowing jury trials in actions against foreign states was "to promote a uniformity in decision when foreign governments are involved." H.R.Rep. No. 1487 at 13; 1976 U.S.Code Cong. & Ad. News at 6611–12. Further, suits brought against the United States may be tried to a jury only if the right is guaranteed by an appropriate statute. *Galloway v. United States*, 319 U.S. 372, 63 S.Ct. 1077, 87 L.Ed. 1458 (1943). In many instances it is not. *See generally* 5 J. Moore, Federal Practice ¶ 38.31[2] (2d ed. 1984). Congress could have considered that it should subject foreign states engaged in commercial activity to lawsuits on the same terms the United States must defend itself.[8] Such a consideration can be viewed as important to the United States' foreign relations. This does not mean Congress could require that a case be tried without a jury whenever it concludes it is a good idea. Such a decision would be subject to scrutiny under the seventh amendment. But where, as here, this decision does not invoke seventh amendment implications, we can consider only whether the decision bears a rational relationship to a legitimate governmental objective. *See G.D. Searle & Co. v. Cohn*, 455 U.S. 404, 102 S.Ct. 1137, 1141, 71 L.Ed.2d 250 (1982); *Harris v. McRae*, 448 U.S. 297, 100 S.Ct. 2671, 2691, 65 L.Ed.2d 784 (1980). We conclude that it does. Thus, the district court was correct in trying the case without a jury.

## IV. WHETHER THE DISTRICT COURT ERRED IN RULING IN FAVOR OF APPELLEES

Appellants next contend that the district court incorrectly ruled in favor of Dominicana on the negligence and breach of contract claims. We reject their arguments with respect to both claims.

### A. *Negligence: Breach of Duty to Warn*

■ Appellants argue that Florida law requires that Dominicana, as a common carrier, exercise the "highest degree of care, foresight, prudence and diligence reasonably demanded at any time by the conditions or circumstances that affected the passengers and the carrier." *Werndli v. Greyhound Corp.*, 365 So.2d 177, 178 (Fla. Dist.Ct.App.1978) (quoting *Whitman v. Red Top Sedan Service, Inc.*, 218 So.2d

---

mon law." *Goar*, 688 F.2d at 427; *see Purnell v. Southall Realty*, 416 U.S. 363, 94 S.Ct. 1723, 40 L.Ed.2d 198 (1974); *FDIC v. New London Enterprises*, 619 F.2d 1099 (5th Cir.1980). The distinction involved in this case is that a waiver of immunity creates rights and remedies that never before existed. *Goar*, 688 F.2d at 427; *Ruggiero*, 639 F.2d at 880–881.

**8.** Each of the courts that has upheld the FSIA's nonjury trial requirement has analogized this provision to the denial of jury trials in suits against the United States. *Goar*, 688 F.2d at 426; *Rex*, 660 F.2d at 67; *Williams*, 653 F.2d at 882; *Ruggiero*, 639 F.2d at 879–81. The Supreme Court on several occasions has reaffirmed that there is no seventh amendment right to a jury trial in those instances when the United States has waived its sovereign immunity. *Lehman v. Nakshian*, 453 U.S. 156, 101 S.Ct. 2698, 2701–2701, 69 L.Ed.2d 548 (1981) (because of United States' immunity from suit, seventh amendment right never existed with respect to suit against United States, and does not attach when immunity has been waived); *Galloway v. United States*, 319 U.S. 372, 388–89, 63 S.Ct. 1077, 1086, 87 L.Ed. 1458 (1943) ("It can hardly be maintained that under the common law in 1791 jury trial was a matter of right for persons asserting claims against the sovereign."); *McElrath v. United States*, 102 U.S. (12 Otto) 426, 440, 26 L.Ed. 189 (1880) (suits against the United States in the Court of Claims are not suits at common law; the United States cannot be sued without its consent and this principle necessarily permits the sovereign to prescribe procedures to be used in such suits). Although there are different rationales for the immunities, this does not affect the seventh amendment issue. *Goar*, 688 F.2d at 426; *Ruggiero*, 639 F.2d at 880. "A suit against a foreign state was just as unknown to the common law of 1791 as was a suit against the United States." *Ruggiero*, 639 F.2d at 880.

213, 216 (Fla.Dist.Ct.App.1969)).[9] According to appellants, Dominicana breached its duty to exercise this degree of care because Dominicana previously had transported persons to the Dominican Republic who were not permitted to enter the country by immigration officials. Aware of this potential danger to its passengers, Dominicana nevertheless failed to provide any warning of this possibility.

We need not decide whether Florida law would obligate an airline to ensure that its passengers were aware that they might not be permitted to enter a foreign nation, because Dominicana's failure to warn cannot be seen as the cause in fact of appellants' injury.[10] *See Stahl v. Metropolitan Dade County*, 438 So.2d 14, 17–19 (Fla.Dist.Ct. App.1983); Restatement (Second) of Torts § 432(1). Appellant Ramiro Arango testified at trial, and admitted in his deposition, that he knew that foreign nations do not permit everyone who attempts to travel within their borders to do so. Moreover, Ramiro testified that he himself had been denied entry into a foreign nation on three occasions prior to the one that led to this litigation. Under these circumstances, Dominicana cannot be liable for failure to warn appellants that they might be turned away by immigration officials. *See Perez v. National Presto Industries*, 431 So.2d 667, 669 (Fla.Dist.Ct.App.1983); *Wickham v. Baltimore Copper Paint Co.*, 327 So.2d 826, 827 (Fla.Dist.Ct.App.1976).

B. *Misrepresentation*

Appellants advance another theory in their effort to impose liability upon Dominicana. Appellants purchased from Dominicana, for two dollars apiece, tourist visas that read "Welcome to the Dominican Republic." The cards were blank when they were tendered to the Arangos; the Arangos filled in their names and the other required information. Appellants now argue that Dominicana misrepresented the nature of these cards, and that they were given the impression that "all would be taken care of with respect to their trip." It is not clear what representations the Arangos claim they relied upon. The cards do state the terms under which a tourist may travel in the Dominican Republic, but do not purport to guarantee that possession of a card will ensure entry into the Dominican Republic, nor did Ramiro Arango testify that any Dominicana agent told him that they would. This deficiency aside, the theory of recovery fails anyway because Ramiro Arango admitted that he was aware that each nation had its own rules with respect to the admission of tourists. Hence, appellants cannot reasonably claim that they relied upon these alleged misrepresentations. *See Butts v. Dragstrem*, 349 So.2d 1205, 1206–07, (Fla.Dist.Ct.App.1977).

C. *Duty to Provide Food and Lodging*

Appellants further argue that Dominicana breached its duty to exercise care on behalf of its passengers by forcing them to

---

**9.** None of the parties filed any papers stating an intent to raise an issue of foreign law pursuant to Fed.R.Civ.P. 44.1. Nor is there any contention that any law other than Florida's should govern the outcome of this case.

**10.** It is not even clear what such a warning would entail, or how effective it would be. It may be one thing to require that an airline carrying passengers internationally ensure that its passengers know that a valid passport and travel visa are necessary to enter a foreign country. *See Compagnie Nationale Air France v. Castano*, 358 F.2d 203, 208–09 (1st Cir.1966). A Dominicana agent testified that appellee does make sure that all passengers travelling internationally possess valid passports. To charge an airline that it is responsible for warning passengers of other reasons why they may be denied entry would impose on it a difficult task. *Cf. Sprayregen v. American Airlines*, 570 F.Supp. 16, 17–18 (S.D.N.Y.1983) (it would be unreasonable to require an airline to warn of how altitude changes might affect particular physical or emotional conditions of its passengers). Foreign nations may not disclose the reason why a person is denied entry. For example, in this case, there is nothing in the record that clearly explains why Ramiro Arango was refused entry into the Dominican Republic. Further, the court below found that Dominicana did not have access to the list of undesirable foreigners. Thus, the airline could do no more than state that for unknown reasons, the Dominican Republic has refused to allow certain travelers to enter its borders.

spend the night in San Juan at their own expense. After denying the Arangos entry into the Dominican Republic, immigration officials ordered Dominicana to transport them out of the country. The Arangos were rerouted to San Juan, where, according to Ramiro Arango, they inquired about flights to Miami. Ramiro testified that Dominicana's San Juan agent told him to come to the airport the next morning. When Arango asked whether Dominicana would provide his family with food and lodging for the evening, the Dominicana agent responded in the negative. The Arangos proceeded to a hotel, where they paid for lodging and meals.

 A common carrier is obligated to exercise a high degree of care with respect to the boarding, carriage, and disembarkment of its passengers. *Atlantic Greyhound Lines v. Lovett*, 134 Fla. 505, 184 So. 133, 136 (1938); *Pividal v. City of Miami*, 105 So.2d 502, 503 (Fla.Dist.Ct. App.1958). The requirement that carriers exercise this degree of care may extend to the provision of terminals into which passengers enter upon exiting the carrier. *Eastern Airlines v. Dixon*, 310 So.2d 336, 338 (Fla.Dist.Ct.App.1975) (Hendry, J., concurring). *But see Werndl v. Greyhound Lines*, 412 So.2d 384, 386 & n. 3 (Fla.Dist. Ct.App.1982). There is no duty, however, that required Dominicana to pay for the Arangos' food and lodging in San Juan under the circumstances of this case. Dominicana was ordered by immigration officials to transport the appellants out of the country on the very next flight leaving for their country of origin. Ramiro Arango testified that the police even escorted him and his family through the airport and onto the aircraft. Dominicana had no control over the circumstances under which the Arangos were taken to San Juan. Furthermore, the Arangos make no claim that they were unable to pay for food and lodging for some reason attributable to the

airline. To impose the duty requested would require airlines to guarantee the success of its passengers' travel ventures. We conclude, therefore, that Dominicana was under no obligation to pay the Arangos' food and lodging expenses incurred in San Juan.

### D. *Breach of Contract of Carriage*

 Finally, appellants claim that their contracts with Dominicana, created by the purchase of the airline tickets, were breached, because Dominicana did not return them to Miami as promised or pay for their transportation aboard another carrier. Once Dominicana was ordered to take the Arangos out of the country, Dominicana issued them tickets for passage to San Juan and from San Juan to Miami. The trip from San Juan to Miami was arranged aboard Eastern Airlines, because at the time Dominicana did not fly that route. The Arangos were not scheduled for any particular Eastern flight. The day after they arrived in San Juan, they flew to Port-au-Prince, Haiti via Air France, using new tickets issued by Dominicana. Their return to Miami was aboard Pan Am. Ramiro Arango testified that he paid cash for the flight from Port-au-Prince to Miami.

The court below concluded that there was no breach of contracts because the court found that the Arangos voluntarily decided to travel to Port-au-Prince instead of returning to Miami. This decision was made to enable the Arangos to vacation in Haiti as a substitute for their failed plans. Although Ramiro Arango testified that his family flew to Haiti in an effort to secure passage to Miami, there is substantial evidence in the record that contradicts this explanation. We can overturn the district court's finding on this issue only if it is clearly erroneous, Fed.R.Civ.P. 52(a), and we conclude that it is not. We hold therefore that Dominicana did not breach its contract of carriage.[11]

11. In their brief, appellants make several references to the opinion that disposed of the initial appeal in this case, apparently in an effort to establish that the district court's opinion violates the law of the case. This contention has no merit. The former Fifth Circuit ruled only that some of the appellant's claims sufficed to survive a motion to dismiss, while observing that

## V. CONCLUSION

Unfortunately for the Arangos, their vacation was not as planned. Under the theories advanced in this case, however, Dominicana cannot be held liable for their losses. The judgment of the court below in favor of Dominicana is therefore AFFIRMED. We instruct the district court to take the appropriate action in entering final judgment that will resolve the Arangos' claims against defendants Guzman and Trailways.

flaws in the theories of recovery may become evident at a later date. *Arango,* 621 F.2d at 1381–82.