In re AIR CRASH DISASTER NEAR ROSELAWN, INDIANA ON OCTOBER 31, 1994.

Appeal of Theresa A. SEVERIN, as Executor of the Estate of Patricia Henry, Deceased, Roberta Spencer, Special Administrator of the Estate of Kenneth Bartlett Spencer, Deceased, Stewart MacKenzie, Co–Executor of the Estate of Betty Innes Struth Tweedie, Deceased, et al.

No. 96–2130.

United States Court of Appeals, Seventh Circuit.

Argued June 5, 1996.

Decided Sept. 19, 1996.

Robert A. Clifford (argued), Kevin P. Durkin, Chicago, IL, for Plaintiff–Appellant Roberta Spencer.

Thomas A. Demetrio, Philip H. Corboy, Michael K. Demetrio, Corboy & Demetrio, Robert A. Clifford, Kevin P. Durkin, Chicago, IL, for Plaintiff–Appellant Stewart MacKenzie

Douglas R. Brown, James W. Brauer, Stewart & Irwin, Indianapolis, IN, for Plaintiff–Appellant Chris E. Ferryman.

William J. Harte, Chicago, IL, for Plaintiff–Appellant Karen J. Ernst.

David Katzman, Schaden, Wilson & Katzman, Birmingham, MI, for Plaintiff–Appellant Mary Elaine Ramm.

Herbert Stride, Stride & Associates, Chicago, IL, David Katzman, Schaden, Wilson & Katzman, Birmingham, MI, for Plaintiff–Appellant Joan Leech.

D.L. Salem, Law Offices of D.L. Salem, San Diego, CA, for Plaintiff–Appellant Eileen Ganong.

Martin E. Klein, Law Offices of Martin E. Klein, Chicago, IL, for Plaintiff–Appellant Frank Harast.

Sidney I. Schenkier, Jerold S. Solovy, Anton R. Valukas, Jenner & Block, Chicago, IL, Charles W. Douglas, Sheila A. Sundvall, Sara J. Gourley, Sidley & Austin, Chicago, IL, for Defendant–Appellee AMR Corp.

Sidney I. Schenkier, Jerold S. Solovy, Anton R. Valukas, Jenner & Block, Chicago, IL, Sheila A. Sundvall, Sidley & Austin, Chicago, IL, Robert L. Alpert, Chapel Hill, NC, Hugh R. Koss (argued), Lillick & Charles, San Francisco, CA, for Defendant–Appellee AMR Eagle, Inc.

Sidney I. Schenkier, Jerold S. Solovy, Anton R. Valukas, Jenner & Block, Chicago, IL, Charles W. Douglas, Sheila A. Sundvall, Sidley & Austin, Chicago, IL, for Defendant–Appellee Robert H. Mittelman.

Douglas Letter, Department of Justice, Civil Division, Appellate Section, Washington, DC, for Intervenor Janet Reno.

Donald J. Nolan, William J. Jovan, Chicago, IL, for Plaintiff–Appellant Theresa A. Severin.

Before COFFEY, MANION, and KANNE, Circuit Judges.

MANION, Circuit Judge.

Sixty-eight people were killed on October 31, 1994, when American Eagle Flight 4184 from Indianapolis to Chicago developed severe icing problems and crashed near Roselawn, Indiana. Numerous lawsuits arose out of the crash. Thirty-two of those cases were filed in, transferred to, or removed to the Northern District of Illinois. This appeal presents the question whether the cases will proceed in federal court, as the defendants desire, or in state court, the choice of the plaintiffs.

The district court ruled that defendant Avions de Transport Regional, G.I.E. ("ATR"), a one-half French, one-half Italian aircraft manufacturer, which was named as a defendant or third-party defendant in all of the suits, could remove the cases to federal court pursuant to 28 U.S.C. § 1441(d) because ATR is a "foreign state" under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1330, 1602–1611. The district court also considered whether the Act was unconstitutional under the Seventh Amendment because it precludes a jury trial. It concluded the FSIA was constitutional, but ruled that while suits against ATR would be tried to the court, actions against the non-foreign defendants would be tried to a jury. 909 F.Supp. 1083 (N.D.Ill.1995). The plaintiffs appeal, challenging each of the district court's rulings. We affirm.

## I. Background

The question central to this appeal is the one we necessarily address first—whether federal subject matter jurisdiction exists in these cases. *Louisville & Nashville R.R. Co. v. Mottley*, 211 U.S. 149, 152, 29 S.Ct. 42, 43, 53 L.Ed. 126 (1908). "The power of the federal judiciary is limited. . . . [T]he substance of allegations (i.e., their intended effect on the rights of the parties), not their form, is determinative" of subject matter jurisdiction. *Christianson v. Colt Indus. Operating Corp.*, 798 F.2d 1051, 1055–56 (7th Cir.1986). We begin therefore by examining those allegations: On what grounds do the plaintiffs seek relief? And, who (or what) are the parties?

*The Lawsuits*

The plaintiffs in these cases are representatives of the estates of the crash victims. They have sued for wrongful death. Most of the suits name the airline, American Eagle, its parent company AMR, and entities related to them. Most of the suits also name ATR, which manufactured the ATR72–210 aircraft involved in the crash, ATR's U.S.-based affiliates, and entities related to them. In a few of the actions the plaintiffs do not name ATR as a direct defendant, and domestic defendants have filed third-party complaints against ATR seeking contribution and indemnification.

*Avions de Transport Regional, G.I.E.*

ATR's company structure is important for the issues this case presents.[1] It was created in 1982 by a joint French and Italian intergovernmental agreement "to develop their civil aeronautic industry within the framework of European cooperation." ATR is a commercial company created under French law. Despite its government patrons, it is not owned directly by the French and Italian governments, but indirectly through two European commercial aerospace companies, each of which owns 50% of ATR's shares. The French company is Aerospatiale, Societe Nationale Industrielle, S.A. ("SNIA"). The Italian company is Alenia.

SNIA is the French national aerospace company. The French government owns 91.42% of SNIA, with the remainder in private hands. Of the shares owned by the French government, 62.16% are owned directly, and 20% more through a company named Sogepa. Credit Lyonnais Industria owns the remaining 17.81%, which in turn is owned by Credit Lyonnais, 52% of which is owned by the French government. The French government and Sogepa together control SNIA through their six directors on its board, five of whom are representatives of the French ministries of economy, defense, and transportation.

Alenia is a division of Finmeccanica SpA, which is 62.14% owned by the Italian Instituto Per La Riconstruzione Industriale ("Insti-

1. ATR's structure is graphically represented in Appendix A.

tute for Industrial Reconstruction") ("IRI"). IRI is a holding company wholly owned by the Italian government through its treasury ministry. Through these intermediaries, France and Italy retain indirect ownership of approximately 75% of ATR. The countries also exercise substantial control over ATR by retaining approval authority and by appointing the officials who manage it.

*Foreign Sovereign Immunities Act*

■ The FSIA is the only United States statute providing jurisdiction over suits against foreign states or their instrumentalities. *Saudi Arabia v. Nelson,* 507 U.S. 349, 355, 113 S.Ct. 1471, 1476, 123 L.Ed.2d 47 (1993); *Argentine Republic v. Amerada Hess Shipping Corp.,* 488 U.S. 428, 434–35, 443, 109 S.Ct. 683, 688, 693, 102 L.Ed.2d 818 (1989). Congress passed the FSIA in 1976 to establish statutory standards defining when foreign states and their instrumentalities may be sued in United States courts. Generally, the Act preserves immunity from suit, though it grants federal jurisdiction when a foreign state waives such immunity or engages in commercial rather than sovereign activity. *Amerada Hess,* 488 U.S. at 434 n. 1, 109 S.Ct. at 688 n. 1; *Verlinden B.V. v. Central Bank of Nigeria,* 461 U.S. 480, 486–88, 103 S.Ct. 1962, 1967–68, 76 L.Ed.2d 81 (1983).

■ The FSIA broadly defines "foreign state" to "include[ ] a political subdivision of a foreign state or an agency or instrumentality of a foreign state." 28 U.S.C. § 1603(a). An " 'agency or instrumentality of a foreign state' means any entity ... which is a separate legal person, corporate or otherwise, and ... which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof." 28 U.S.C. § 1603(b). In the FSIA, Congress intended the phrase "foreign state" to include separately incorporated entities. *See* H.R.Rep. No. 94–1487, 94th Cong., 2d Sess., at 15–16 (reprinted at 1976 U.S.S.C.A.N. 6613) ("entities which meet the definition of an 'agency or instrumentality of a foreign state' could assume a variety of forms, including ... a transport organization such as a shipping line or airline....").

Congress intended to insulate foreign states from jury trials in the Act. *Id.* at 13, 32–33 (reprinted at 6611–12, 6631–32); *accord* S.Rep. No. 94–1310, 94th Cong., 2d Sess. 12, 32 (1976).

■ The FSIA provides that "[a]ny civil action brought in a State court against a foreign state as defined in § 1603(a) ... may be removed by the foreign state to the district court of the United States for the district ... embracing the place where such action is pending. Upon removal, the action shall be tried by the court without jury." 28 U.S.C. § 1441(d). This section confers original but not exclusive jurisdiction on federal district courts in actions involving foreign states. By enacting the FSIA, Congress meant to encourage litigants to bring actions involving foreign states in federal courts. It also intended that such actions could continue to be brought in state courts, however. *See Martropico Compania Naviera S.A. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara (Pertamina),* 428 F.Supp. 1035, 1037 (S.D.N.Y.1977) (after FSIA Congress left option open to choose state courts to sue foreign states).

*Procedural History*

Contending it is an instrumentality of a "foreign state" under 28 U.S.C. § 1603(a), ATR removed the state court cases to federal court pursuant to 28 U.S.C. § 1441(d), including those in which it was a third-party defendant. The Judicial Panel on Multidistrict Litigation transferred other cases arising out of the crash to the district court and the cases were consolidated.

Plaintiffs moved to remand the cases, asserting that ATR is not a foreign state under the FSIA. They offered three main arguments. First, to be a foreign state within § 1603(a), an entity must be majority-owned by one foreign government; "pooled" ownership of more than one foreign government should not be allowed under the FSIA. The plaintiffs thus asserted that ATR does not meet the statutory definition of "foreign state" because neither France nor Italy owns more than 50% of ATR. Second, for an entity to be a foreign state, a majority own-

ership interest must be held *directly* by a foreign government; "tiered" foreign government ownership through intermediaries, even if they are "foreign states" under the Act, should not suffice under the FSIA. Third, in those cases in which ATR is named as a third-party defendant, plaintiffs argued that even if ATR is a foreign state, under § 1441(d) it could only remove those claims pleaded directly against it.

After full briefing of the remand motions, the district court *sua sponte* ordered briefing on two other questions: (1) did the FSIA violate the Seventh Amendment's right to jury trial by defining "foreign state" to include entities other than the foreign sovereign itself?; and (2) is the FSIA invalid if it allows a foreign state instrumentality named as a third-party defendant to remove an entire action?

*District Court Opinion*

In a thorough opinion, the district court resolved each of these issues. First, it found that the FSIA did not prevent "pooling" or "tiering," and thus that it applies to ATR. 909 F.Supp. at 1090–97. Then, it held that ATR properly removed all the cases, including those in which ATR was named as a third-party defendant. *Id.* at 1097–1104. Finally, it rejected plaintiffs' contention that the FSIA violated the Seventh Amendment. *Id.* at 1104–1114. The court avoided any Seventh Amendment problem with third-party removal by interpreting the FSIA to allow a jury trial on the claims against the domestic defendants. *Id.* at 1114. The district court then certified its rulings for immediate interlocutory appeal pursuant to 28 U.S.C. § 1292(b). This court granted the interlocutory appeal request on each of the certified issues.

## II. ATR As A Foreign State Under The FSIA

The first question presented is whether the structure of ownership interests in ATR supports its claim to status as a foreign state under the FSIA. The district court concluded that the ownership interests of more than one foreign government may be added together ("pooled"), 909 F.Supp. at 1093, and that indirect ("tiered") foreign governmental ownership interests held through intermediary entities may be considered in determining whether an entity satisfies the ownership requirement necessary for "foreign state" status under 28 U.S.C. § 1603. *Id.* at 1097.

### A. Pooling

■ The purpose and history of the FSIA provide instructive background for answering this first question. Under the Act, Congress vested in the federal courts original jurisdiction over any civil action against a "foreign state" as defined in § 1603(a), 28 U.S.C. § 1330(a), and also created a right of removal to federal court of any civil action brought in state court against such a foreign state. 28 U.S.C. § 1441(d). In the FSIA, Congress sought to promote uniformity in cases involving foreign governments, and to provide them with a means of escape from potentially biased state court proceedings. *See Goar v. Compania Peruana de Vapores*, 688 F.2d 417, 422 (5th Cir.1982) ("By including in § 1330(a) suits against corporations owned by foreign sovereigns, Congress obviously intended to extend the policy of uniformity to these entities."); *Williams v. Shipping Corp. of India*, 653 F.2d 875, 879 (4th Cir.1981) ("Both the statutory language and the legislative history evince the congressional desire to achieve uniformity of decisional law in the area of suits against foreign sovereigns."), *cert. denied*, 455 U.S. 982, 102 S.Ct. 1490, 71 L.Ed.2d 691 (1982). In the FSIA, Congress did not define "agency or instrumentality" to encompass just foreign sovereigns. See 28 U.S.C. § 1603(b)(2). For example, in 28 U.S.C. § 1611(b)(1), Congress used both "foreign state" and "foreign government"; thus, the drafters knew the difference between these phrases. Instead, Congress included within the Act corporations, "a majority of whose shares or other ownership interest is owned by a foreign state or a political subdivision thereof." 28 U.S.C. § 1603(b)(2). Congress expressly contemplated that business entities could qualify as foreign states under the FSIA, and that they "could assume a variety of forms, including . . . a state trading corporation, . . . [or] a transport organization such as a shipping line or airline." House Report at 6614.

■ ATR is the product of an international joint commercial venture between France and Italy which acted together "to develop their civil aeronautic industry within the framework of European cooperation." These two countries indirectly own approximately three-fourths of ATR. Further, they control and manage it by retaining approval authority over its actions and by appointing the officials who monitor and manage it. This indicates that ATR qualifies under the Act's definition of "an agency or instrumentality" as a corporation "a majority of whose shares or other ownership interest is owned by a foreign state or a political subdivision thereof." 28 U.S.C. § 1603(b)(2). Nearly every court that has considered the issue of "pooling" has reached this same conclusion: the ownership interests of more than one foreign government may be combined to reach the majority ownership required by § 1603(b)(2). *See, e.g., Mangattu v. M/V IBN Hayyan,* 35 F.3d 205, 208 (5th Cir.1994) (entity 100% owned by foreign states and created by agreement of all participating states satisfied "majority" requirement; FSIA does not require that majority of interest be owned by single foreign state); *Kern v. Jeppesen Sanderson, Inc.,* 867 F.Supp. 525, 530–31 (S.D.Tex.1994); *LeDonne v. Gulf Air, Inc.,* 700 F.Supp. 1400, 1406 (E.D.Va.1988). The district court employed this reasoning, recognized this authority, and concluded that ATR qualified as a "foreign state" under the FSIA. *See* 909 F.Supp. at 1092.

The plaintiffs offer a subtle statutory argument for why, notwithstanding majority foreign (albeit indirect) ownership, ATR is not a "foreign state" and thus why these cases should not be removable. As the last requirement for qualifying as an "agency or instrumentality of a foreign state" under § 1603(b)(3), the corporation must not be "created under the laws of any third country." Plaintiffs reason that because Alenia owns 50% of ATR, which is a corporation created "under the laws of a third country," namely France, § 1603(b)(3) does not permit Alenia's shares to be considered in determining whether a majority of ATR's shares are owned by a "foreign state or political subdivision thereof." *See Gardiner Stone Hunter v. Iberia Lineas Aereas,* 896 F.Supp. 125, 132

(S.D.N.Y.1995). For the plaintiffs, only with respect to France is ATR "not created under the laws of any third country." Thus, the argument goes, only the shares held by SNIA "count." Because those shares do not exceed 50%, a majority of ATR's shares are not "owned by a foreign state or political subdivision thereof," § 1603(b)(2) of the Act is not satisfied, and the cases should be remanded.

■ Plaintiffs read the applicable statutes too prosaically. We construe the Act to state that so long as the entity claiming status under the FSIA is formed under the laws of one of the member nations to the international agreement or multinational joint venture, then it satisfies § 1603(b)(3). The FSIA requires that the corporation not be created under the laws of a third country, that is, a nation not a member of the multinational joint venture. In persuasive opinions, other courts have read the statute this way. *See Mangattu,* 35 F.3d at 209; *LeDonne,* 700 F.Supp. at 1406. Alenia is incorporated under the laws of Italy, a joint venturer with France in ATR, and thus is not created under the laws of a third country.

Just as important, this reading gives effect to the purpose and history of the FSIA, each of which reflects that suits against commercial entities controlled by foreign governments (such as ATR) are contemplated under the Act. *See Arango v. Guzman Travel Advisors,* 761 F.2d 1527, 1534 (11th Cir.), *cert. denied,* 474 U.S. 995, 106 S.Ct. 408, 88 L.Ed.2d 359 (1985); *Goar,* 688 F.2d at 422. The plaintiffs' statutory construction does not take account of the whole of the Act, and would lead to an absurd result. A company owned 50.01% by one foreign state and the remainder by private interests would be entitled to the FSIA's protections, but an entity owned 50% each by two foreign states with no private ownership would not. Statutes must be interpreted to avoid such inconsistencies. *Time Warner Cable v. Doyle,* 66 F.3d 867, 876 (7th Cir.1995), *cert. denied,* ——— U.S. ———, 116 S.Ct. 974, 133 L.Ed.2d 894 (1996).

Notably, the authority the plaintiffs cite does not support their argument. *Gardiner*

*Stone* expressly recognized that ownership interests of multiple foreign governments may be pooled where the entity was a "multi-national joint venture." 896 F.Supp. at 131. *See also Mangattu,* 35 F.3d at 209. ATR is just such a joint venture between France and Italy. The Italian ownership of ATR is not merely an investment in a private commercial enterprise as a "joint risk-taker" (as plaintiffs' argument suggests) or in a French government venture. The Italian signatory to the agreement creating ATR would not have been an Italian governmental minister if that were the case. Rather, the venture is a joint sovereign act by Italy and France. ATR is created by an intergovernmental agreement. A majority of ATR is government-owned. It has government controls in its charter. Government ministers monitor and manage it. It was created to further public goals. In the document creating ATR, each country has reciprocal rights and obligations under their national laws. Thus, the Italian ownership interest of ATR must be considered, not ignored as if Italy had no hand in creating the corporation.

The ownership interests of France and Italy may be "pooled" under the FSIA. Because all of ATR's shares are owned by foreign sovereigns, it qualifies as an instrumentality under the FSIA's definition in § 1603(b)(2).

## B. Tiering

Plaintiffs present a second argument why ATR does not qualify as an "agency or instrumentality of a foreign state" under 28 U.S.C. § 1603(b). They claim ATR cannot invoke the FSIA's removal provision, because ATR is owned *equally* by two commercial parent companies—one an instrumentality of a foreign state (SNIA), the other a corporate subsidiary of an instrumentality of a foreign state (Alenia). They argue that § 1603(b) is not satisfied unless *both* SNIA and Alenia qualify as "a foreign state or political subdivision thereof." The plaintiffs say neither company can satisfy this requirement. Because ATR's shares are owned by commercial companies ("tiered"—that is, held through intermediaries)—not a "foreign state or political subdivision thereof"—plaintiffs

contend that the requirements of § 1603(b)(2) are not met. They submit Congress intended to narrowly limit qualifying majority shareholders under the FSIA to just these two types of entities. They assert that pursuant to *Gates v. Victor Fine Foods,* 54 F.3d 1457 (9th Cir.), *cert. denied,* —— U.S. ——, 116 S.Ct. 187, 133 L.Ed.2d 124 (1995), an instrumentality such as ATR may not redefine itself as a "foreign state" under the Act because this reading would render superfluous references in § 1603(b) to "a political subdivision."

The district court concluded France and Italy may "tier" their ownership interests through corporate intermediaries SNIA and Alenia and still fall within the Act. It recognized that nearly all courts which have confronted indirect or "tiered" ownership situations have considered majority state-owned corporations to be "agencies or instrumentalities of foreign states" under the FSIA, even where the state ownership was indirect. *See* 909 F.Supp. at 1093. It also employed what plaintiffs term "infinite loop" reasoning: If "foreign state" under the Act "includes ... an agency or instrumentality of a foreign state" (*see* § 1603(a)), which in turn includes a separate corporation "which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is *owned by* a foreign state or political subdivision thereof" (sec. 1603(b)), then a corporation which is directly majority-owned by a foreign state constitutes a "foreign state" itself. Thus, the plaintiffs continue, a corporation which is owned by a corporation which in turn is owned by a foreign state is both *owned by* a foreign state and *is* a foreign state. Under this reading of the FSIA:

> so long as the corporate intermediaries standing between a foreign state and a defendant seeking to invoke foreign-state status are themselves majority-owned by a statutorily-defined "foreign state" (which, to be explicit, includes an agency or instrumentality of a foreign state), such tiering of ownership interests will not deprive the defendant of foreign state status.

909 F.Supp. at 1094.

Plaintiffs criticize this logic, relying heavily on *Gates,* in which the Ninth Circuit inter-

preted the FSIA to require direct rather than indirect ownership by a foreign government in the entity claiming "foreign state" status. Plaintiffs argue that § 1603(a) cannot be read to redefine instrumentalities as "foreign states." First, they assert the term "includes" in § 1603(a) ["a foreign state *includes* . . . an agency or instrumentality of a foreign state"] means "encompasses," not "is defined as." *See id.,* 54 F.3d at 1462. Second, they contend that the text of § 1603(b)(2) contradicts the district court's "infinite looping" construction of § 1603(a). If Congress had intended "agencies or instrumentalities of a foreign state" to mean "foreign state," it also would have intended "political subdivision" to mean "foreign state," because § 1603(a) defines "foreign state" to include both a political subdivision of a foreign state or an agency or instrumentality of a foreign state. *Id.,* 54 F.3d at 1462. According to plaintiffs, to construe § 1603(a) as the district court did renders the phrase "or political subdivision thereof" superfluous because it construes "foreign state" as already including its own political subdivisions (909 F.Supp. at 1095–96), a result unacceptable to plaintiffs.

The plain language of § 1603(a) defines "foreign state" broadly. The House Report's analysis of that statute confirms this broad definition set out in the statute. See 909 F.Supp. at 1095 (quoting 1976 U.S.S.C.A.N. at 6613). There, the committee specified that § 1603(a)'s definition of "foreign state" applied to all provisions in the Act except § 1608, where it referred only to a foreign sovereign. This distinction is again made in 28 U.S.C. § 1611(b) (". . . the property of a foreign state shall be immune from attachment and from execution, if—(1) the property is that of . . . its parent foreign government. . . ."). To limit "foreign state" to "foreign sovereign" or "foreign government" would be to rewrite the Act, which is obviously beyond our role as judges. We

are to apply the law as Congress intended, not rewrite it as we prefer. "The question of what change, if any, should be made in the existing law is one of legislative policy properly within the exclusive domain of Congress—it is a question for law makers, not law interpreters. Our task is the more limited one of interpreting the law as it now stands. In dealing with problems of interpretation and application of federal statutes, we have no power to change deliberate choices of legislative policy that Congress has made within its constitutional powers. Where congressional intent is discernible— and here it seems crystal clear—we must give effect to that intent." *Sinclair Refining Co. v. Atkinson,* 370 U.S. 195, 214–15, 82 S.Ct. 1328, 1339, 8 L.Ed.2d 440 (1962) (footnote omitted).

The court in *Gates* decided that the word "includes" limits the definition of "foreign state." 54 F.3d at 1462.[2] The district court in this case, however, reasoned that if a "foreign state" as defined in § 1603(a) "includes" an "agency or instrumentality of a foreign state," then a corporation that is majority owned by a "foreign state" "includes" a corporation majority owned by an "agency or instrumentality of a foreign state." 909 F.Supp. at 1094–95. We agree with the district court's reasoning. The use of "includes" shows Congress' intent to broadly define "foreign state." This is consistent with the statement in the legislative history that instrumentalities could assume "a variety of forms" (H. Rep. at 6614), including "a transport organization such as a[n] . . . airline." Plaintiffs claim that the reference to "political subdivisions" in § 1603(b)(2) is rendered superfluous (or at least redundant) by the district court's construction. Even if so construed, it cannot alter our reading of the entirety of the FSIA, in which corporations with ATR's precise characteristics may

2. Although embraced in *Gardiner Stone,* we agree with the district court's decision not to rely on *Gates. See* 909 F.Supp. at 1096. *Gates* failed to consider any of the many cases which uphold the foreign state status of corporations indirectly owned by foreign governments, including other Ninth Circuit decisions which we find persuasive. *See, e.g., Corporacion Mexicana de Servicios*

*Maritimos, S.A. de C.V. v. M/T Respect,* 89 F.3d 650, 655 (9th Cir.1996) (same); *Straub v. A.P. Green,* 38 F.3d 448, 451 (9th Cir.1994) (same), and *America West Airlines, Inc. v. GPA Group, Ltd.,* 877 F.2d 793, 796 (9th Cir.1989) (subsidiary of corporation owned by Republic of Ireland a "foreign state" under § 1603(a)).

be considered an agency or instrumentality of a foreign state.

*Gates* concludes that the phrase "or political subdivision of" limits "foreign state" as used in § 1603(b)(2) to "foreign *government.*" This conflicts with our construction of the FSIA in *Allendale Mut. Ins. Co. v. Bull Data Systems, Inc.,* 10 F.3d 425 (7th Cir. 1993), in which we considered whether two Zenith companies were "foreign states" under the FSIA. Each was 100% owned by another, single corporation, which in turn was 90% owned by France. We ruled that the two Zenith companies were "foreign states" under § 1603(b)(2) because "the Act's definition includes companies a majority of whose shares are owned by a foreign state." *Id.* at 427. *See also State Bank of India v. NLRB,* 808 F.2d 526, 535 (7th Cir.1986) (State Bank of India a "foreign state" under FSIA because it was 92% owned by Reserve Bank of India, which is in turn owned by India), *cert. denied,* 483 U.S. 1005, 107 S.Ct. 3229, 97 L.Ed.2d 735 (1987); *Alberti v. Empresa Nicaraguense De La Carne,* 705 F.2d 250, 253 (7th Cir.1983) ("FSIA defines a 'foreign state' as including an agency or instrumentality of a foreign sovereign"). Our reading of the Act also comports with the construction other courts have given it in similar circumstances. *E.g. Antoine v. Atlas Turner, Inc.,* 66 F.3d 105, 109 (6th Cir.1995) (corporation owned by another corporation in turn owned by political subdivision of foreign state is "instrumentality of a foreign state"); *Straub v. A.P. Green,* 38 F.3d at 451 (same); *America West Airlines,* 877 F.2d at 795–96 (subsidiary of corporation owned by Republic of Ireland a "foreign state" under § 1603(a)); *Gilson v. Republic of Ireland,* 682 F.2d 1022, 1026 (D.C.Cir.1982) ("clear" that subsidiary corporation owned indirectly by Ireland a "foreign state" under the FSIA).

Close analysis confirms the district court's resolution of the question of "tiering." The Act does not expressly require direct ownership, nor does it exclude the form in which France and Italy hold ATR as an instrumentality. SNIA is an "agency or instrumentality of a foreign state" because it is more than 90% owned by France and meets the other requirements of § 1603(b). Likewise, Alenia is an "agency or instrumentality of a foreign state" because it is a division of Finmeccanica SpA, which is 62% owned by I.R.I., which is a holding company 100% owned by Italy. *See* Appendix A.

Although France and Italy controlled ATR through intervening entities, the language and legislative history consistent with the language of the FSIA demonstrate that ATR is the type of corporation included within the statutory definition of "foreign state." Because ATR meets the FSIA's requirement of majority foreign state ownership, it properly removed these cases to federal court.

### III. Removability of Cases In Which ATR Is A Third–Party Defendant

In a number of these Roselawn air crash cases, the plaintiffs do not name ATR as a direct defendant, but domestic defendants have filed third-party complaints against ATR seeking contribution and indemnity. Even if ATR is deemed an "instrumentality of a foreign state" under the FSIA, plaintiffs assert § 1441(d)[3] authorizes ATR to remove *only* the third-party claims against it, *not* the entire case.

Plaintiffs argue various constructions of § 1441(d) in support of this conclusion. To them, "civil action" in the first sentence of § 1441(d) concerning the scope of removal must mean the same as "action" in the second sentence concerning the right to a bench trial. To construe it otherwise, they assert, disregards the statutory canon of consistency: the same language used in different parts of a statute is presumed to have the

---

**3.** Title 28 U.S.C. § 1441(d) provides in relevant part:

Any *civil action* brought in a State court against a foreign state as defined in section 1603(a) of this title may be removed by the foreign state to the district court of the United States for the district and division embracing the place where such action is pending. Upon removal the *action* shall be tried by the court without jury.

(Emphases supplied.)

same meaning. *See Atlantic Cleaners & Dyers, Inc. v. United States,* 286 U.S. 427, 431, 52 S.Ct. 607, 608, 76 L.Ed. 1204 (1932). Plaintiffs contrast § 1441(c), which expressly authorizes removal of "the entire case," with § 1441(d), which has no such language. They use this distinction to buttress their reading that ATR can remove only the third-party claims in those suits in which it is so named, leaving the other claims in state court. They also argue that if "civil action" means ATR can remove the entire case, then § 1441(d) would deprive them of their right to a jury trial against non-foreign state defendants. Plaintiffs submit their reading of § 1441(d) meets Congressional objectives in passing the FSIA because a foreign state still is able to remove third-party claims against it and maintain its statutory right to a bench trial.

The district court held that "civil action" in the first sentence of § 1441(d) means the entire case, while "action" in the second sentence means only the claim against the foreign state defendant. 909 F.Supp. at 1097–1104, 1112–14. The court found that § 1441(d) and its legislative history make "quite plain the Congressional intent that *all* claims, not just those against the foreign state, would be removed" under § 1441(d). *Id.* at 1101 (emphasis in original). The district court's resolution also preserved plaintiffs' right to a jury trial against non-foreign state defendants. *Id.* at 1114.

Plaintiffs fight an uphill battle. As we recently noted, "[t]he majority view is that the statute authorizing the removal of suits against a foreign state, 28 U.S.C. § 1441(d), authorizes the removal of the entire case, even if there are nonforeign defendants." *Alonzi v. Budget Constr. Co.,* 55 F.3d 331, 333 (7th Cir.1995). We could not resolve this issue in *Alonzi* because we lacked jurisdiction. Here, without that problem, we look to a well-developed body of case law, § 1441(d)'s language, and its legislative history to decide the question.

▮ Persuasive authority supports the district court's reading. Nearly all courts to have considered this issue have rejected plaintiffs' position and held that where minimal diversity exists between parties, a foreign state may invoke § 1441(d) to remove an entire suit. These courts have relied on a literal reading of the statute: in § 1441(d), Congress spoke of removal of "the action," not just "the claim." They also cite the statute's legislative history. *See In re Surinam Airways Holding Co.,* 974 F.2d 1255, 1258–59 (1992) ("the language and legislative history of § 1441(d) lead us to conclude that, where a claim has been filed against a foreign state, Congress did not intend removal jurisdiction to be limited to some subset of the claims or parties involved in that action."); *Nolan v. Boeing Co.,* 919 F.2d 1058, 1064 (5th Cir.1990) ("we can perceive no significant distinction between the authorization for removal of an entire action by a sovereign codefendant, and removal of an entire action by a sovereign third-party defendant") (footnote omitted), *cert. denied,* 499 U.S. 962, 111 S.Ct. 1587, 113 L.Ed.2d 651 (1991); *Chuidian v. Philippine Nat'l Bank,* 912 F.2d 1095, 1098–99 (9th Cir.1990) (same); *Teledyne, Inc. v. Kone Corp.,* 892 F.2d 1404, 1407–1410 (9th Cir.1989) (where minimal diversity exists among adverse parties, FSIA provides federal jurisdiction over pendent parties); *Arango v. Guzman Travel Advisors Corp.,* 621 F.2d 1371, 1375–77 (5th Cir.1980) (where a sovereign defendant in a multi-party suit removes a case under § 1441(d), entire action against all defendants accompanies it to federal court).

The interpretation of § 1441(d) in these cases is consonant with the congressional intent behind the FSIA: to create a uniform body of law (and minimize potential international friction) by establishing federal courts as the preferred forum for cases involving foreign states. *See* House Report, 1976 U.S.S.C.A.N. at 6631. The history of § 1441(d) is manifest on this point: it "permits the removal of any such action at the discretion of the foreign state, even if there are multiple defendants and some of these defendants desire not to remove the action and are citizens of the State in which the

action has been brought." *Id.* Such involuntary removal could occur only if § 1441(d) envisioned removal of the entire action. *See Chuidian,* 912 F.2d at 1099; *Arango,* 621 F.2d at 1375.

Plaintiffs' "inconsistency" argument does not take them far. Consistency among terms is indeed important, but also important is construing a term so it is consistent with the rest of the statute and congressional intent. Construing "civil action" in the first sentence of § 1441(d) to address the scope of removal, and "action" in the second sentence to pertain to the separate issue of the scope of jury trial, properly harmonizes the statute's language with its purpose. It permits foreign states to remove entire civil actions in which they are parties, thus preserving their immunity from jury trial while it also permits jury trials against non-foreign state parties. This reading gives effect to all of the language of § 1441(d) and comports with the FSIA's legislative history. *See* 909 F.Supp. at 1114. That § 1441(c) uses "the entire case" and § 1441(d) uses "civil action" suggests a linguistic but not substantive difference. For this reason, plaintiffs' argument has been rejected elsewhere. *Nolan,* 919 F.2d at 1066 ("terms 'case' and 'action' refer to the same thing, *i.e.,* the entirety of a civil proceeding, which necessarily includes any third-party claims").[4]

Finally, and dispositively on this removability issue, even if we did not find § 1441(d) broad enough to encompass pendent party jurisdiction, a third-party foreign state defendant can remove this entire case on the basis of supplementary jurisdiction. 28 U.S.C. § 1367(a).[5] On these facts,

§ 1367(a) provides that a federal court may exercise jurisdiction over all claims in a case involving a foreign sovereign. *See, e.g., Lopez del Valle v. Gobierno de la Capital,* 855 F.Supp. 34, 37 (D.P.R.1994) ("Even if the FSIA did not affirmatively grant jurisdiction over pendent-parties, we could exercise such jurisdiction pursuant to 28 U.S.C. § 1367(a) because the claims ... form part of the same case or controversy....").

The district court properly gave effect to the language and purpose of § 1441(d). In those cases in which ATR is named as a third-party defendant, it could remove the entire action, including the first-party complaint against the defendants upon which the third-party claims against ATR are premised.

## IV. Constitutionality Of The FSIA Under The Seventh Amendment

The Seventh Amendment provides that "[i]n Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved...." This amendment preserves the right to jury trial as it existed under English common law when the amendment was adopted in 1791. *See Markman v. Westview Instruments, Inc.,* —— U.S. ——, ——, 116 S.Ct. 1384, 1389, 134 L.Ed.2d 577 (1996). To discern whether the amendment applies, we pose what is called the "historical" test: was the cause of action at issue, or at least an analogous action, tried at law at the time of the Founding? If so, must a jury render decision at trial to preserve the substance of the common-law right as it existed in 1791? *Id.*

4. The district court also persuasively distinguished *Schlumberger Indus., Inc. v. National Sur. Corp.,* 36 F.3d 1274 (4th Cir.1994), which held that 28 U.S.C. § 1330(a) did not confer pendent party jurisdiction over nonforeign-state codefendants, on the ground that the facts in *Schlumberger* were unique (foreign defendant dismissed before merits of case reached). *See* 909 F.Supp. at 1098–1104. We agree with the district court's analysis on this point.

5. Title 28 U.S.C. § 1367(a) provides in relevant part:

in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

" "The Constitution is a written instrument. As such its meaning does not alter. That which it meant when adopted, it means now.' We have long recognized that the meaning of the Constitution 'must necessarily depend on the words of the constitution [and] the meaning and intention of the convention which framed and proposed it for adoption and ratification to the conventions ... in the several states.'" *McIntyre v. Ohio Elections Comm'n,* —— U.S. ——, ——, 115 S.Ct. 1511, 1525, 131 L.Ed.2d 426 (Thomas, J., concurring) (quoting *South Carolina v. United States,* 199 U.S. 437, 448, 26 S.Ct. 110, 111, 50 L.Ed. 261 (1905), and *Rhode Island v. Massachusetts,* 37 U.S. (12 Pet.) 657, 721, 9 L.Ed. 1233 (1838)). The right to jury trial had an established meaning at the framing of the Constitution that is preserved in the Seventh Amendment. To determine that meaning, we look to the contours of that right as it was understood in 1791.

The plaintiffs contend the FSIA violates the Seventh Amendment because it requires suits against foreign state instrumentalities to be tried to the court rather than a jury. The district court considered whether the FSIA's extension of jury immunity from the foreign sovereign to a corporation majority-owned by that sovereign violated the Seventh Amendment. It concluded "there simply was not enough historical evidence that an action against a corporation owned by a foreign sovereign is an action 'of the sort traditionally enforced in an action at law' to overcome the presumption of constitutionality that must be afforded an Act of Congress." 909 F.Supp. at 1114.

On appeal, plaintiffs continue to argue that the Act's bench trial requirement must be stricken. They assert Congress lacked authority to limit fact-finding to a bench trial where the claims are legal and thus include a constitutional right to jury trial. They cite discussions of immunity in two treatises from the late 18th century in an attempt to show that English common law recognized suits against foreign states or their instrumentalities in 1791. They submit also that the "separate entity" doctrine—no sovereign enjoys immunity in commercial transactions conducted through a corporation—guarantees them the right to jury trial that the FSIA denies.

■ An Act of Congress bears a strong presumption of constitutionality. "Given the deference due 'the duly enacted and carefully considered decision of a coequal and representative branch of our Government,' we do not lightly second-guess such legislative judgments...." *Bd. of Educ. of Westside Community Schools v. Mergens,* 496 U.S. 226, 251, 110 S.Ct. 2356, 2372, 110 L.Ed.2d 191 (1990) (internal citations omitted). Moreover, the six courts of appeals that have examined the validity of the FSIA under the Seventh Amendment have upheld the Act's prohibition on jury trials against foreign state entities.[6] None have concluded to the contrary.

## A. Nature of Plaintiffs' Claims

Plaintiffs contend first that the FSIA violates the Seventh Amendment because their wrongful death actions for money damages typify actions tried to juries in 1791. *See Chauffeurs, Teamsters and Helpers, Local No. 391 v. Terry,* 494 U.S. 558, 570, 110 S.Ct. 1339, 1347, 108 L.Ed.2d 519 (1990) ("action for money damages was the traditional form of relief offered in the courts of law"). They argue that Congress lacks the power to limit suits under the FSIA to bench trials if the claims are legal rather than equitable. Plaintiffs rely on *Terry,* where even though a union member's claim had not been known in 18th-century England, he was entitled to a jury trial because the issue to be tried (breach of duty of fair representation) and the remedy sought (back pay) were, when combined, analogous to suits recognized at common law. *Id.* at 569–73, 110 S.Ct. at 1347–49.

---

**6.** *Universal Consolidated Cos., Inc. v. Bank of China,* 35 F.3d 243 (6th Cir.1994); *Arango v. Guzman Travel Advisors,* 761 F.2d 1527 (11th Cir.), *cert. denied,* 474 U.S. 995, 106 S.Ct. 408, 88 L.Ed.2d 359 (1985); *Goar v. Compania Peruana de Vapores* 688 F.2d 417 (5th Cir.1982); *Rex v.* *Cia. Pervana De Vapores, S.A.,* 660 F.2d 61 (3d Cir.1981), *cert. denied,* 456 U.S. 926, 102 S.Ct. 1971, 72 L.Ed.2d 441 (1982); *Williams v. Shipping Corp. of India,* 653 F.2d 875 (4th Cir.1981); *Ruggiero v. Compania Peruana de Vapores,* 639 F.2d 872 (2d Cir.1981).

That plaintiffs' claims are legal and not equitable is a necessary but not a sufficient condition for a jury trial. To warrant protection under the Seventh Amendment, the claims must be against the type of defendant suable at common law in 1791. *Bank of China,* 35 F.3d at 245 ("the most important characteristics of suits under the [FSIA] is that they are suits against foreign states, not that they are suits based in tort or contract or asking for damages or injunctive relief"); *Williams,* 653 F.2d at 883 ("To invoke the Amendment, it is not enough that the nature of the plaintiff's action is 'legal' rather than maritime or equitable; the action must also be brought against a defendant who was suable at common law in 1791.") A suit under the FSIA is against a foreign sovereign. A sovereign was not properly a defendant in a suit at common law in 1791. *See Glidden Co. v. Zdanok,* 370 U.S. 530, 572, 82 S.Ct. 1459, 1484, 8 L.Ed.2d 671 (1962) (suits against government were not suits at common law within meaning of Seventh Amendment); *Galloway v. United States,* 319 U.S. 372, 388–89, 63 S.Ct. 1077, 1086–87, 87 L.Ed. 1458 (1943) (suits against sovereign not cognizable at common law in 1791).

Plaintiffs claim this principle applies only to suits against the United States, not to those against a foreign state. They provide no relevant support for this claim. Under Article I of the Constitution, Congress decides "whether and under what circumstances foreign nations should be amenable to suit in the United States." *Verlinden,* 461 U.S. at 493, 103 S.Ct. at 1971. This historical fact of sovereign immunity allows Congress to grant the privilege of suing under the FSIA, but also to limit that privilege to bench trials. *See Glidden,* 370 U.S. at 571, 82 S.Ct. at 1483. The historical evidence surveyed by the Supreme Court and the six courts of appeals to consider this question demonstrates that a suit against a foreign state was known in 1791, but not then cognizable under the common law. *See infra* IV.B. Moreover, the common law nature of the claims asserted—an action at law for tort damages—cannot overcome the fact that the sovereign status of the defendant also determines the applicability of the Seventh Amendment. Congress, by making 28 U.S.C. § 1330 the sole basis for federal jurisdiction over foreign states, has provided that the sovereign status of the defendant determines how it may be sued. *See Bank of China,* 35 F.3d at 245. The nature of plaintiffs' claims therefore does not entitle them to a jury trial.

## B. *Historical Test*

To analyze plaintiffs' second argument for why the FSIA violates the Seventh Amendment, "we compare the statutory action to 18th-century actions brought in the courts of England prior to the merger of the courts of law and equity." *Markman,* —— U.S. at ——, 116 S.Ct. at 1389 (quoting *Granfinanciera, S.A. v. Nordberg,* 492 U.S. 33, 42, 109 S.Ct. 2782, 2790, 106 L.Ed.2d 26 (1989)). Because the district court could not locate any pre–1791 cases against a corporation owned by a foreign sovereign arising out of a commercial transaction, it concluded that plaintiffs' suits against ATR are not "[s]uit[s] at common law" within the meaning of the Seventh Amendment. Plaintiffs attempt to convince us otherwise by asking us to look at two treatises by 18th-century international law scholars.

The law does not support plaintiffs' argument. The Supreme Court has explained on a number of occasions how "[f]rom the Nation's founding until 1952, foreign states were generally granted ... complete immunity from suit in United States courts, and the Judicial Branch deferred to the decisions of the Executive Branch on such questions." *Amerada Hess,* 488 U.S. at 434 n. 1, 109 S.Ct. at 688 n. 1. This began with *The Schooner Exchange v. M'Faddon,* 11 U.S. (7 Cranch) 116, 3 L.Ed. 287 (1812), in which the Court held that a federal court had no jurisdiction for a libel action against a French warship in the port of Philadelphia. *Id.* 11 U.S. (7 Cranch) at 144–45. More recently, the Court explained the breadth of this ruling: "Although the narrow holding of *The Schooner Exchange* was only that the courts of the United States lack jurisdiction over an armed ship of a foreign state in our port, that opinion came to be regarded as extending virtually absolute immunity to foreign sovereigns." *Verlinden,* 461 U.S. at 486, 103 S.Ct.

at 1967–68 (citing *Berizzi Brothers, Co. v. S.S. Pesaro*, 271 U.S. 562, 46 S.Ct. 611, 70 L.Ed. 1088 (1926)). In *Berizzi Brothers*, the Court found the immunity principle of *The Schooner Exchange* equally applicable when commercial activities of a foreign sovereign are involved. *Id.* at 574, 46 S.Ct. at 612. The six courts of appeals which have examined this question canvassed considerable historical sources and found no convincing evidence that the English courts recognized such a suit. *See, e.g., Bank of China*, 35 F.3d at 245–46 (rejecting one 1791 English case and comment by Dutch scholar Cornelius Van Bynkershoek as historical argument to depart from universal judicial agreement that suit against foreign state was unknown at common law in 1791); *Goar*, 688 F.2d at 425–26 (foreign sovereigns immune from suit in survey of English and American common law); *Williams*, 653 F.2d at 881–82 ("We think it is manifestly clear that in 1791 a suit against a foreign government could not be maintained in either the courts of America or England."); *Ruggiero*, 639 F.2d at 878 ("It is undisputed that a suit against a foreign state was unknown to the common law.").

In an attempt to overcome this law, plaintiffs refer to discussions of diplomatic immunity in two treatises by 18th-century international law scholars, Emmerich de Vattel and Cornelius Van Bynkershoek. As in *Markman*, however, in which the Supreme Court found a smattering of equivocal 18th century English cases insufficient historical evidence that patent construction claims were tried to juries in 1791, — U.S. at ——–——, 116 S.Ct. at 1391–92, these treatises do not carry the day. The section of Vattel's treatise plaintiffs cite concerns suits against an ambassador's property because of his personal business dealings in a trade, and not the commercial dealings of a foreign state, directly or through an instrumentality. *Cf. Berizzi Brothers*, 271 U.S. at 566–67, 46 S.Ct. at 611 (foreign state does not have dual identity because state has no "personal" capacity). The part of the Bynkershoek treatise plaintiffs rely on states that international law allows attachment against certain property owned by an ambassador and used as part of a business enterprise. Further, it discusses incidents involving Dutch and other

continental courts, not the common law of England. *See Bank of China*, 35 F.3d at 245 ("Bynkershoek was speaking about Dutch law, not the common law.") These scholars demonstrate that in 1791, merchant ambassadors could be sued for their private business dealings. Their works do not establish that English common law at the ratification of the Seventh Amendment recognized trial by jury for suits against foreign states or their instrumentalities. The district court correctly analyzed the historical evidence to conclude that at common law, suits against foreign sovereigns were not permitted, and that the same immunity extended to commercial entities owned by foreign governments. *See Arango*, 761 F.2d at 1534 (nothing presented to contradict conclusion that suits against foreign sovereigns or commercial entities controlled by them not permitted in 1791; thus, no right to jury trial attached under Seventh Amendment).

### C. Separate Entity Doctrine

██ Under the "separate entity" doctrine, at common law a sovereign was not immune in commercial transactions conducted through a corporation. Plaintiffs assert this would have permitted suits against foreign government-owned corporations in 1791. They rely on *Bank of United States v. Planters' Bank of Georgia*, 22 U.S. (9 Wheat.) 904, 6 L.Ed. 244 (1824), in which the Supreme Court found that a bank incorporated in Georgia was not the state itself, and thus was not included under Article I, § III of the U.S. Constitution, which provides original jurisdiction in the Supreme Court for suits by or against the states. *Id.* 22 U.S. (9 Wheat.) at 907.

In *Planters' Bank*, the Supreme Court addressed waiver of Eleventh Amendment immunity. In contrast, foreign sovereign immunity is a matter of comity by the United States, not a restriction imposed by the Constitution. *See Verlinden*, 461 U.S. at 486, 103 S.Ct. at 1967; *see also Bank of China*, 35 F.3d at 245. In *Planters' Bank*, a domestic state was deemed to have waived immunity by engaging in commercial activity. 22 U.S. at 907. But at common law, foreign states were not deemed to have done so. *See Ber-*

*izzi Bros., Co.,* 271 U.S. at 574, 46 S.Ct. at 612.

██ Under the FSIA, a foreign instrumentality owned by a foreign state is considered a foreign state for immunity purposes. 28 U.S.C. § 1603(a). *Planters' Bank* tells us only that the Supreme Court's original jurisdiction is not invoked when a corporation in which a domestic state has an interest is the defendant. The FSIA is not unconstitutional under the "separate entity" doctrine. *See Arriba Ltd. v. Petroleos Mexicanos,* 962 F.2d 528, 538 (5th Cir.) ("*Planters' Bank* has no bearing on the issue of whether foreign sovereigns are immune from suit in the courts of the United States.") (emphasis in original), *cert. denied,* 506 U.S. 956, 113 S.Ct. 413, 121 L.Ed.2d 337 (1992).

We have concluded that ATR is a foreign state instrumentality and thus covered by the FSIA. The type of suit plaintiffs wish to bring against ATR was contemplated but not allowed at the adoption of the Seventh Amendment. Plaintiffs have not demonstrated that under the common law in England in 1791 such a suit would have been permitted and tried to a jury. The non-jury trial provision of the FSIA is a central element to Congress' "comprehensive scheme" to promote uniformity of decision and avoid biased, inconsistent, and disparate verdicts in cases involving foreign states. *E.g., Bank of China,* 35 F.3d at 246; *Ruggiero,* 639 F.2d at 880. Absent any persuasive demonstration of unconstitutionality, we will not invalidate an important statute such as the FSIA. *See Markman,* —— U.S. at ——–——, 116 S.Ct. at 1392–93; *Rex,* 660 F.2d at 63. For all these reasons, we join the six courts of appeals which have ruled that Congress' decision in the FSIA to bar jury trials against foreign states and their instrumentalities is consistent with the Seventh Amendment.

The district court's decision is AFFIRMED. This case is REMANDED for further proceedings.

APPENDIX A.

---

[1] Aerospatiale, Societe Nationale Industrielle, S.A.

[2] Avions de Transport Regional, G.I.E.

[3] Instituto Per La Riconstruzione Industriale ("Institute for Industrial Reconstruction").